**SCOTT PAPER COMPANY, Plaintiff,**

**and**

**Chester Davis, Intervenor,**

**v.**

**MOORE BUSINESS FORMS, INC., Defendant.**

**Civ. A. No. 77–199–JLL.**

United States District Court, D. Delaware.

Sept. 5, 1984.

---

Rudolf E. Hutz and John D. Fairchild of Connolly, Bove, Lodge & Hutz, Wilming-ton, Del., and John W. Kane, Jr., Philadelphia, Pa., of counsel, for plaintiff.

William J. Wier, Jr., of William J. Wier & Associates, Inc., Wilmington, Del., and Richard H. Evans and Peter J. Manso of Wood, Herron & Evans, Cincinnati, Ohio, of counsel, for intervenor.

Edward M. McNally of Morris, James, Hitchens & Williams, Wilmington, Del., and John J. Held, Jr., Edward W. Remus and Paul H. Berghoff of Allegretti, Newitt, Witcoff & McAndrews, Ltd., Chicago, Ill., of counsel, for defendant.

## OPINION

LATCHUM, Senior District Judge.

## I. INTRODUCTION

This aged and hardfought patent infringement action, unlike most such cases, developed into an emotionally charged and controversial piece of civil litigation. As the case unfolded before trial, during reissue proceedings before the United States Patent and Trademark Office ("PTO"), during discovery, and at trial, the evidence exposed some of the unattractive sides of human nature. It was unique in this respect.

This action was originally brought on May 22, 1977, by the plaintiff, Scott Paper Company ("Scott"), against the defendant, Moore Business Forms, Inc. ("Moore"). (Docket Item ["D.I."] 1.) The original complaint alleged that: (a) Scott owned U.S. Patents 3,193,404 ("the 404 patent") and 3,278,327 ("the 327 patent") (collectively called the "Davis patents"); (b) Scott in 1972 at Moore's request granted a royalty bearing license to Moore under the two Davis patents; (c) Moore paid substantial royalties to Scott for four years until mid-1976; (d) Moore "effectively terminated" the license agreement in 1976; (e) Moore continued to practice the Davis inventions as an unlicensed infringer; and (f) Moore's infringement of the patents since mid-1976 was wilful and wanton. (*Id.*) Moore answered the original complaint and alleged

that the Davis patents were invalid and unenforceable. (D.I. 7.)

In November 1977, Scott filed applications to reissue the Davis patents (TX 300, 301).[1] The reissue proceedings before the PTO lasted for four years. (*Id.*) Moore actively participated as a protester throughout the reissue proceedings, contending that the Davis inventions were not patentable and that Davis had been guilty of fraud and inequitable conduct. (*Id.*) After a most comprehensive examination, the PTO rejected Moore's protests and Reissue Patents 30,797 (the "404/797 patent") and 30,803 (the "327/803 patent") were granted to Scott respectively on November 16, 1981 and November 24, 1981 (TX 1090, 1091). Both reissued patents expired in mid-1982.

Scott filed an Amended and Supplemental Complaint on November 24, 1981, asserting two alternative theories for recovery. Count I sought compensatory and punitive damages and interest based on Moore's failure to pay royalties under the License Agreement between Scott and Moore relating to the Davis patents. Count II sought treble damages, attorneys' fees and costs based on Moore's wilful infringement of the Davis patents and reissue patents. (D.I. 32.)[2] On May 19, 1982, Davis was permitted to file a complaint in intervention in which he asserted rights against Moore and Scott on the basis of an "equitable interest" in the patents arising out of a 1965 contract between Scott[3] and Davis (TX 307). Answering the Scott and Davis complaints, Moore asserted defenses that the Davis patents (1) were invalid because (a) the inventions were obvious, and (b) that the inventions were "on sale" in this country more than one year prior to their effective filing dates, (2) were unenforceable because of Davis' unequitable conduct before the PTO in procuring the patents, (3) were not infringed by Moore, and that Davis had no cause of action against Moore. (D.I. 34 at 46.)

Following the reissue proceedings and intervention of Davis, the parties engaged in extensive discovery. A twelve-day trial[4] to the Court sitting without a jury took

1. TX refers to trial exhibits introduced at trial; Tr. to the trial transcript; and D.I. to docket entries.

2. As a result of the trial testimony, Scott abandoned its breach of contract claim and sought to recover on the theory of wilful infringement from 1976 when Moore allegedly terminated the Scott-Moore licensing agreement. (D.I. 169 at 35; D.I. 184 at 52–53; D.I. 192 at 42–44.) Jurisdiction of Scott's patent infringement action exists by virtue of 28 U.S.C. § 1338(a) and venue is proper under 28 U.S.C. § 1400(b).

3. The inventor, Davis, and S.D. Warren Company of Westbrook, Maine ("Warren") entered into an agreement on July 1, 1965, wherein Warren agreed to pay $15,000 to Davis for a right to study the inventions for 10 months and an option to acquire them (TX 307). At the end of the 10-month period, Warren exercised the option and acquired all rights to the Davis inventions (Tr. 916, 1980–84). When Scott acquired Warren in 1967, Scott also acquired full title to the Davis patents by written assignments. (D.I. 113 at 5.) For simplicity in this opinion, Warren is often referred to as Scott.

4. The Court heard six witnesses in Scott's case-in-chief: Chester Davis, the inventor (Tr. 48–638); Dr. Norman Macaulay, Moore's Associate Director of Chemical Development (Tr. 640–905); Frederick D. Richter, Assistant Research Director, Patents and Licensing of S.D. Warren, a Division of Scott (Tr. 901–971); John F. Witherspoon, a patent attorney and former member of the PTO Board of Appeals (Tr. 976–1161); Dr. Anthony E. Vassiliades, a practical expert in developing carbonless copy systems (Tr. 1167–1273); and Ronald N. Fox, Scott's Manager of Corporate Planning and Valuation (Tr. 1273–1288). The Court also heard six witnesses called by Moore: Robert H. Downie, a former Vice President and Director of Research of Moore (Tr. 1292–1469); Dr. Norman Macaulay, identified above (Tr. 1469–1612); Dr. William J. Bailey, Professor of Chemistry at University of Maryland (Tr. 1613–1872); Stephen J. Buchanan, Financial Associate for Moore (Tr. 1873–1909); Millard C. Spencer, former employee of S.D. Warren (Tr. 1921–1983); and Dr. Herbert F. Rance, consultant and expert for Moore (Tr. 1988–2131). The Court also heard in Scott's rebuttal the testimony of Mr. Fox, already identified (Tr. 2136–2145) and Dr. John A. Mattor, Senior Research Associate of S.D. Warren (Tr. 2146–2167). The Court also viewed a videotaped deposition of Nancy Mitchell, a Moore employee (D.I. 185). The trial transcript of these witnesses exceeded 2,200 pages and two file drawers of exhibits were admitted into evidence.

place between February 6–22, 1984. After carefully considering the sufficiency, weight and credibility of the testimony of the witnesses, their demeanor on the stand, the documentary evidence admitted at trial, and the post-trial briefs of the parties, the Court enters the following findings of fact and conclusions of law which are embodied in this opinion as permitted by Rule 52(a), Fed.R.Civ.P.

## II. THE FACTS

### A. *The Inventions In Issue*

The inventions in issue involve carbonless recording paper having a colorless dye precursor coated on the back side (coated back or "CB" sheet). To make a business form, the CB sheet is laid atop a second sheet having a clay coating on its front side (coated front or "CF" sheet). When the top surface of the CB sheet is impressed with a pencil or by a typewriter key, the corresponding dye precursor coated on the CB sheet is transferred to the second CF sheet where, upon contact with the clay, it becomes colored and reproduces the impressed image.

To make a multi-part or multi-leaved business form, several additional sheets may be placed between the top CB sheet and the bottom CF sheet. These are called CFB sheets, because they each have clay coated on the front, and colorless dye precursor coated on the back. The pressure of an image impressed on the top surface of the CB sheet is transmitted through the several CFB sheets to the CF sheet, producing the colored image on the front (clay coated) surface of each. (D.I. 113, § 3, ¶¶ 12–13; Tr. 59–61, 1178–79 & 1306–07; TX 2.)

Carbonless recording paper of this general type was disclosed in the patent literature by the 1930's, and was first developed commercially by National Cash Register, now NCR, in the early 1950's. NCR used a two component colorless dye precursor system in carbonless paper, namely, a combination of CVL (Crystal Violet Lactone) and BLMB (Benzoyl Leuco Methylene Blue) (Tr. 62–64, 664, 1200 & 1999).

Chester Davis, the inventor, worked for NCR from 1947 to 1952, following receipt of his Bachelor of Science Degree in chemistry from Indiana University in 1944 and a Master of Science Degree in organic chemistry from the University of Wisconsin in 1945 (Tr. 52–55). In 1954, Davis returned to Indiana University as a research associate and post-doctorate fellow (Tr. 57–58). While in this position, Davis recognized that the recently introduced NCR business forms had many deficiencies, and he decided to try to develop a recording paper which would avoid those deficiencies and be superior (Tr. 61–69). At Indiana University, Davis lectured during the day but had the use of a chemistry laboratory in the evening for his own purposes (Tr. 69–73).

Davis initially developed a theory involving Crystal Violet, a triphenylmethane dye, which was the most intense color former then known to dye chemists. The molecular structure of Crystal Violet includes a central carbon atom, and Davis proposed to "hook something" onto the central carbon atom which would convert colored Crystal Violet to a colorless form. This would be different from the NCR approach of chemically modifying one or more of the three phenyl groups of the Crystal Violet molecule, which produced CVL (Tr. 69–73).

Davis knew that Crystal Violet Base itself was too unstable to be used in a carbonless system, changing to blue-violet too easily, and staining the skin. He also knew that Crystal Violet Cyanide, another Crystal Violet derivative, could be made in a colorless form, but it was too stable and "you couldn't get the color back out again." Mr. Davis theorized that adding something to the central carbon atom might effect a workable compromise, but there were "hundreds of thousands" to "millions" of available possibilities (Tr. 74–75).

Davis first tried amines, but they also proved to be unstable. He next found a compound in the literature (Beilstein) called Crystal Violet Thiocarbinol which was said to be a white crystalline material. He

made it, but "Beilstein was wrong" because it "turned out to be not white, not stable, and no good" (Tr. 75–77). Davis then experimented with a diphenylmethane dye, Michler's Hydrol, which has only two instead of three phenyl groups attached to the central carbon atom. Michler's Hydrol Thiocarbinol proved to be a little better than Michler's Hydrol itself, but it gave a slow reaction with ordinary paper and "wasn't any good either" (Tr. 78–80).

Davis became discouraged, and in February of 1955 he "sat back and tried to figure out what I could substitute on that Crystal Violet central carbon atom." He formed another theory, to put a meta directing group, such as nitro, carbonyl or sulfonyl, directly on the central carbon atom. The nitro group made "a mess" so that idea went "down the drain." He did not know how to put a carbonyl or sulfonyl group directly on the central carbon atom, however, so he again referred to Beilstein to see if any Crystal Violet derivative of that type had ever been made (Tr. 80–83; TX 1141–B).

Beilstein, a German publication consisting of about 100 volumes (Tr. 1784–85), was available to Davis at Indiana University in 1954–55. He first looked for a Crystal Violet nucleus with either a carbonyl or sulfonyl group attached to the central carbon atom, to see if he could learn how to make them. He looked under the name index and the empirical formula index but there was nothing there (Tr. 83–85).

Modifying his initial theory, Davis then checked Beilstein to determine whether a similar material had been made from Michler's Hydrol. He did not find anything in the name index because of Beilstein's improper nomenclature, but he found three compounds in the formula index and one of them was described as a "sulfone." Beilstein described how to make the sulfone, but it did not say anything meaningful about color forming properties; it only stated that the sulfone dissolved in mineral acids with a blue color (Tr. 90–91).[5] Davis then believed he had found something

which might fit the theory that he had developed, and he went back to the lab to make the sulfone. If it turned out to be unstable, then there would be no point in going any further. If it turned out to be too stable, however, then he might be able to make the corresponding Crystal Violet derivative in which he originally was interested (Tr. 83–91; TX 1143 at 91–118).

Davis made the "sulfone" by a procedure which differed from the one in Beilstein, but one with which he had experience in making other materials. He reacted Michler's Hydrol with benzene sulfinic acid, producing what is now called the benzene sulfinate of Michler's Hydrol ("BSMH"). Based on Beilstein's description of the compound as a "sulfone," Davis expected the procedure to take a long time. To his surprise, the reaction occurred immediately (Tr. 93–97).

Davis re-crystallized the BSMH which he had obtained, from either benzene or toluene, and tested its solubility in hot and cold benzene. He could not get enough of the BSMH to dissolve in cold benzene to give any worthwhile test. By dissolving it in hot benzene, however, he obtained a strong enough solution to give an immediate strong blue color on clay but no color on newsprint. He believed that this showed him that BSMH was in the stability range he was seeking—less stable than Crystal Violet Cyanide but more stable than Crystal Violet Base (Tr. 101–05).

From these tests Davis concluded that BSMH was not soluble enough at room temperature to have any apparent commercial value in recording systems. Nonetheless, Davis believed he had made the first "Davis dye salt," a sulfinate derivative of Michler's Hydrol, which might be useful as a color precursor if the solubility problems could be overcome.

Davis next made the paratoluene sulfinate of Michler's Hydrol (PTSMH). It proved to him to have a "marked jump" in solubility, and it gave a very intense blue color on clay, but no coloration on news-

---

5. This is apparently a common occurrence in organic chemistry. (Tr. 1778–79.)

print. He testified: "The minute I saw it didn't all come out in benzene ... I tried it out in a mixture of PCB and mineral oil, and it stayed in and gave a very good print. It now had commercial possibilities." (Tr. 110–12.)

Davis first thought that he had made sulfones of Michler's Hydrol, because Beilstein described BSMH as a sulfone. After a month's further work, and based on observations such as the speed of reaction, he began to suspect that the compounds must be salts and not sulfones (Tr. 97–100). Davis observed that when PTSMH was dissolved in acetone it was colorless, but when water was added to that solution it turned intensely blue immediately, meaning that the water was causing a color formation that could not be an acid-base reaction as with the NCR systems (Tr. 97–101, 115–16).

Davis confirmed these findings in oleic acid and soap systems (when washing his hands) and concluded that BSMH and PTSMH formed color by a mechanism that was altogether different from anything described by NCR, a totally new type of reaction which was physical in nature, i.e., dissociation, instead of a chemical reaction. On the basis of all his observations, Davis concluded that colorless PTSMH and BSMH must be associated dye salts and that BSMH was not a sulfone as suggested in Beilstein (Tr. 114–19).

Davis carried out the above work and made his discoveries beginning in February of 1955 (Tr. 124–26; TX 1114–B at 16 et seq.). By May of 1955, Davis was convinced that he had discovered a new recording system which gave images stable to light and humidity, based on inexpensive chemical starting ingredients (Tr. 127, 129). Davis also recognized that the system would require significant additional development work with a lot of materials, waxes, solvents and coating procedures, and that Davis had neither the facilities nor the money to carry out such projects (Tr. 130). He accordingly decided to contact companies and try to interest them in doing the development work (Tr. 127–34).

B. *Davis' Activities To Sell Rights To Develop His Inventions*

Davis first obtained the names of various carbon paper manufacturing companies from a government brochure, and drafted standard letters which he sent in May of 1955 to companies such as Ditto, Smith-Corona, A.B. Dick, Interchemical, Addressograph-Multigraph, Remington Rand, IBM, Burroughs, Royal McBee, and Moore Business Forms (Tr. 134–36; TX 300 at 83–84).

Davis lacked the funds, facilities and intent to make any product that could be sold or offered for sale because that would have required hundreds of pounds of the precursor and large rolls of paper just to start an evaluation (Tr. 134–35). "There was no way I could make even enough to start this out." (Tr. 135.) Davis' letters accordingly explained that he had discovered in his laboratory a new colorless recording system having certain properties, but which needed further evaluation. He offered each company the opportunity to discuss acquisition of the right to develop his inventions (Tr. 134–37; TX 300 at 83–84, 841–42).

Davis learned that many of these companies were not interested because of the "not invented here" syndrome, a common impediment to small inventors seeking to interest large companies in their inventions (Tr. 2052–53). Others wanted a disclosure of the invention, but he told them that he would give only a partial disclosure, without naming the key to his new system, the color precursors (Tr. 138).

In face-to-face meetings with those companies which did indicate an interest, Davis demonstrated the color forming capabilities of his inventions with small pieces of homemade CB sheets containing his secret precursor. To prove that he did not have the same system as NCR's chlorinated biphenyls, he chewed on a sample of his wax-and-precursor to show that it was not toxic (Tr. 138).

Davis also gave representatives of some of these companies little strips of his CB paper. (*Id.*) There was only about fifteen

millionths of a pound of his new dye salt on each little sheet, "about the size of a fly speck." (Tr. 139.) There was no equipment known at that time which could analyze such a small amount of material and determine its chemical composition.[6] (*Id.*) Davis never provided any of the companies which he contacted or anyone else with samples of the dye salt itself, as opposed to dye salt dissolved in a solvent and coated with wax on a few small strips of paper (Tr. 139).

Davis sent one of his standard letters to the president of Moore on May 27, 1955, because Moore was the largest manufacturer of business forms in the United States, possibly in the world. (*Id.*) His letter inquired whether Moore was interested in developing his invention, and offered to discuss the matter with Moore representatives (Tr. 139–40; TX 300 at 265.)

Davis thereafter met with B.J. Staneslow of Moore, and several others, in Niagara Falls, New York. They talked about Davis' invention and how it differed from the NCR system. Davis demonstrated his new product without disclosing the secret dye salt. Moore understood the need for secrecy, and stated, "Naturally, we do not expect you to divulge the identity of your materials." (TX 300 at 274.) Moore evidenced interest, as revealed by Moore's internal memos and the further communications with Davis over the next few months (Tr. 140–45, 716–22; TX 300 at 243–44).

Moore evaluated Davis' inventions as best it could with the limited information imparted by Davis, found that the inventions compared favorably to the NCR paper, and concluded that while a "considerable amount" of work was needed, "there is a strong possibility that Davis has a new colorless dye which could be patented." Moore could not identify Davis' precursor, however, and admitted that "It will be necessary to wait for the disclosure to determine this." (TX 300 at 268–69 & 278–79.)

Davis also learned that Moore had precursor systems of its own under investigation. Moore kept trying to obtain additional information from Davis and would not commit itself, so Davis assumed Moore was "just stalling" and advised them in August of 1955 that he thought Moore would have been "an ideal purchaser for this invention" but he had "just made an oral agreement with a responsible firm for the purchase of an option on my colorless copy paper. For this reason I must inform you that the rights for my colorless copy paper are no longer available." (Tr. 140–43; TX 300 at 281–84.)

The company to which Davis was referring was The McBee Company ("McBee") of Athens, Ohio (Tr. 143). Davis first contacted McBee in May 1955. Davis gave McBee a demonstration of his invention without disclosing the chemical composition of his dye salt and McBee invited Davis for a visit (Tr. 145, 156–57; TX 300 at 140–44).

Davis took some of his dye salt, "I didn't tell them what I had," McBee provided waxes, and Davis ran off about a dozen CB sheets on a small piece of research coating equipment which McBee had (Tr. 158). McBee saw the invention work, "and they liked what they saw." (*Id.*) McBee asked for an option on the rights to Davis' inventions, and an agreement was signed on September 12, 1955 (Tr. 159–160; TX 300 at 146–58). Davis did not tell McBee "anything about what materials were used until they actually bought the option." (Tr. 159.)

During the initial option period, Davis worked with a McBee representative in a locked research room "in privacy" making coatings of Davis dye salts on paper. McBee decided that more development work was needed, and let the option expire on January 13, 1956. McBee returned to Davis all the samples that McBee had made, the copies of the patent applications, and all the other documents.[7] Davis under-

---

6. No testimony was offered which disproved or questioned Davis' testimony on this issue.

7. Paragraph 9 of the option agreement required McBee to make a "complete and exhaustive" patentability search pertaining to the Davis in-

stood that McBee would keep the inventions secret (Tr. 161–67; TX 300 at 78–80, 196–97 & 199–204).

In 1958, Eli Lilly and Company ("Lilly") and Davis also entered into a contract whereby Lilly would investigate another of Davis' inventions, a dinitro Crystal Violet base, which was "altogether different" from the inventions involved in this action (Tr. 178–79). Davis hoped that Lilly would work on developing the sulfinates of Michler's Hydrol as well, but Lilly never did any work of consequence on the sulfinates.

Davis then terminated the agreement with Lilly in January of 1960 because Lilly failed to do the required work, and all the patent rights were reassigned to Davis. Lilly, as McBee, also agreed to keep secret the disclosure made by Davis (Tr. 179–85, 191–95 & 197–98; TX 300 at 78–80, 217–23 & 240–41).

### C. *Patent Procurement History*

In mid-1955, about the time Davis had started his discussions with McBee, he decided to protect his inventions by patenting them. At the Cincinnati Public Library, Davis obtained a pamphlet published by the PTO on how to patent your own invention. Because the pamphlet recommended that inventors engage a patent attorney, Davis contacted Wood, Herron & Evans and met with Mr. Wood (now deceased) in July of 1955 (Tr. 147–49; TX 300 at 822).

To reduce expenses, Davis prepared a "rough draft of the colorless dye salt application in July. Later, I prepared one on the colorless recording paper." Davis gave his drafts to Mr. Wood in August of 1955 (Tr. 149–50; TX 300 at 867–74).

The draft application which Davis prepared on the colorless dye salts acknowledged that BSMH, which he had found in Beilstein, was a known compound (he had not looked up the original Hinsberg articles). Although BSMH was "not listed in Beil-

stein as it would ordinarily be"—it was "listed backwards" as phenyl—Davis named BSMH the same way Beilstein did, "so you could find it":

> The only known member of this series [Davis dye salts], that from Michler's Hydrol and benzenesulfinic acid (called Phenyl – (4,4' - bis-dimethylaminobenzhydryl)-sulfone), is completely insoluble in the usual solvents used in recording systems.

(TX 300 at 870, *compare* p. 296; *see also* Tr. 2119–21.) He used the phrase "The only known member" without specifically identifying a standard reference work like Beilstein because that is the way he had seen it done in patents at NCR and elsewhere (Tr. 154, 360, 370–73; TX 1143 at 13; TX 1675–78).

Davis' reference to the poor solubility of BSMH reflected his above-discussed inability to dissolve BSMH at room temperature in various solvents. Davis fervently believed at that time, and still believes, that this statement "accurately describes the teachings of Beilstein." (Tr. 152–56, 254.)

The two original applications, one on the transfer sheet (TX 1094) and the other on the dye salt (TX 1093), were filed on September 12, 1955 (Tr. 160; *see also* TX 344).

The 1955 transfer sheet application described transfer sheets having on their surface a coating containing a substantially colorless sulfinate salt of Michler's Hydrol (TX 1094; TX 300 at 324–32). Several examples of such sheets were given, and the application stated further that the "dye salt" used in the invention is "more particularly described in my copending application Serial No. 533,877, filed September 12, 1955, for 'Colorless Dye Salts and Their Use'." (TX 300 at 331.)

The 1955 dye salt application described the sulfinate derivatives of Michler's Hydrol and their utility in transfer sheets for colorless recording systems (TX 1093; TX

---

ventions (Tr. 161; TX 300 at 152). McBee said "nothing whatsoever" to Davis about any search results, but a report of the search was sent on January 31, 1956, to Mr. Wood, the patent attorney who assisted Davis, after the option expired

(Tr. 166). This search report was found in the PTO file of one of the Davis applications and identifies "Hinsberg and a whole list of patents." (Tr. 166, 256, 263 & 1011–12; TX 300 at 63–64, 198, 205.)

300 at 292–302). "Michler's Hydrol-p-Toluenesulfinate" (PTSMH) was specifically disclosed (TX 300 at 298), and the application explained that the colorless dye salts "may be used as a component of the coating of a transfer sheet." (TX 300 at 299.) The dye salt application also incorporated by specific reference the entire disclosure of the transfer sheet application (TX 300 at 299), with the result that both 1955 applications disclosed transfer sheets having coatings containing PTSMH (Tr. 1058–62).

PTSMH is a substantially colorless salt of toluenesulfinic acid and 4,4'-bis(Dimethylamino) benzhydrol (Michler's Hydrol), so that claim 11 of the 327/803 Davis reissue patent, for example, appears to be fully supported by the disclosure of the 1955 Davis applications (Tr. 1155, 1160–61; TX 1091, col. 10).

As indicated earlier, the two 1955 Davis patent applications were prosecuted by Davis with the assistance of Mr. Wood (Tr. 170–71). When an Office Action was received from the PTO, Davis wrote up the substance of the response, and Mr. Wood put it in "more formal polished" terminology. (Id.) The PTO allowed some claims, but they did not provide sufficiently broad coverage, so Mr. Wood recommended that additional compounds be made and tested to provide a basis for broader claim coverage (Tr. 170–73).

In order to obtain access to equipment, chemicals and other facilities for further experimentation, Davis accepted employment as a "visiting man" for one year at the Colorado School of Mines (Tr. 173). Davis worked there from the latter part of 1956 to mid-1957, teaching chemistry during the day and working on his inventions at night (Tr. 174). In this manner, he developed further information concerning his inventions, and a better understanding of how to define the dye salts (Tr. 173–74).

On the basis of that work, the two 1955 applications were refiled as continuation-in-part ("CIP") applications in May of 1957 (Tr. 174–75, 999–1002, 1004–05; TX 1095, 1096, 344).

The 1957 transfer sheet application (TX 1095) stated that the "dye salts which are used in the practice of the present invention are more particularly described in my co-pending application Serial No. 533,877, filed September 12, 1955." (TX 1095, 300 at 350–63.) This specific reference appears to have incorporated in the 1957 transfer sheet application the entire disclosure of the 1955 dye salt application (Tr. 175–77, 1155, 1160–61; TX 1095, 1093; see also TX 344).

The 1957 dye salt application (TX 1096, 300 at 383–98) also specifically incorporated by reference the entire disclosure of the 1955 transfer sheet application (TX 300 at 394). This cross-referencing in the 1957 applications to the 1955 applications was in addition to the 1957 applications being CIPs of the corresponding 1955 applications (Tr. 1058–62; TX 1093, 1094, 1095, 1096).

Thus, each of the 1957 applications disclosed transfer sheets having upon their surface a coating containing substantially colorless PTSMH, and each provided sufficient disclosure support for claims, such as claim 11 of the 327/803 reissue patent.

The 1957 transfer sheet application also disclosed diethylbenzene sulfinate of Michler's Hydrol and its utility as a Davis dye salt coated on a transfer sheet (Tr. 1062; TX 1095 at 10).

One aspect of the agreement between Davis and Lilly was that Lilly's attorneys would continue the prosecution of the Davis applications (Tr. 181–83, 186). A Lilly attorney, Dr. VanArendonk (now deceased), rewrote and combined the two 1957 applications into a single application, which was filed on March 19, 1959 (Tr. 187; TX 1097).

Davis understood that the 1959 application was entitled to the benefit of the filing dates of his earlier applications, even though the earlier applications were not specifically mentioned (Tr. 188–97, 205–06; TX 300 at 18–19).

For reasons which were never clear to Davis, Dr. VanArendonk drew the structur-

al formulas of the Davis dye salts as sulfones, but the text of the 1959 application continued to refer to them as salts. The PTO questioned whether the sulfinates should be called "salts," and this issue was fully discussed in the written record (Tr. 188–89, 1108–10).

The Davis 1959 application continued to disclose the use of PTSMH and diethylbenzene sulfinate of Michler's Hydrol in colorless coatings on transfer sheets (Tr. 1057–58).

After Davis reacquired the rights to his inventions from Lilly, he took over the prosecution of the 1959 application himself. Low on funds and being "a brash young man in those days, I got out my own how to patent your own invention brochures, and Mr. Wood's past responses, and I figured since I was a good writer, I could write my own responses." (Tr. 198.)

Davis could not overcome the formal arguments of the Examiner, however, so in 1962 he re-filed VanArendonk's 1959 application as a CIP application. The 1962 application corrected the structure drawings and added some "really precise terms" which Davis hoped would satisfy the Examiner (Tr. 198–99, 206–07; TX 1098).

After filing the 1962 application (TX 1098), Davis did a considerable amount of additional experimental work with coatings on papers, and then filed a separate application in 1964 to cover the colorless recording paper itself (Tr. 208–09; TX 1099).

Davis prosecuted the 1962 and the 1964 applications by himself to a successful conclusion. The 1962 dye salt application (TX 1098) was granted as the original Davis 404 patent on July 6, 1965 (TX 1042), and the 1964 transfer sheet application (TX 1099) was granted as the original Davis 327 patent on October 11, 1966 (TX 1043).

### D. Warren And Scott's Acquisition Of The Inventions

In 1965, Davis contacted S.D. Warren Company of Westbrook, Maine ("Warren"), to determine its interest in his inventions (Tr. 211–12). Davis and Warren entered into an agreement in August of 1965, whereby Warren agreed to pay $15,000 for the right to study the inventions for ten months, and an option to acquire them (Tr. 212–15; TX 307, 382).

The agreement contemplated that Davis would assist Warren in a feasibility study, and that Warren would pay Davis' expenses to travel to Italy to work with the Binda company, a Warren licensee (Tr. 213–14, 1936). Warren employees, Fred Brinnick (now deceased) and Millard Spencer, were assigned part-time to the feasibility study of the Davis dye salts (Tr. 1941). These studies confirmed that the Davis inventions worked (TX 1030).

The only problem was in coating the dye salts on paper because the coatings under investigation were emulsions which did not "glue" the dye salt to the paper in a commercially satisfactory manner as there was premature migration causing smudging or blueing (Tr. 1966–67, 1977–82; TX 1619 at 25, 29–30; TX 1052). Warren recognized that the migration problem could be overcome by using encapsulation, rather than the emulsification system under study, but Warren was afraid to investigate encapsulation systems because of the strong patent position then held by NCR (Tr. 1974–76; TX 1620 at 15–23, 27–28; TX 1618 at 75–76; TX 1619 at 10, 21, 45–46; TX 333, 334).

Warren never commercially developed the Davis inventions, mainly because its fear of NCR imposed constraints against using encapsulation. This fear, financial problems, other compelling projects, and the lack of thin paper capabilities, led Warren to suspend work with the Davis dye salts (Tr. 970–71, 1934, 1949–50, 1977–79; TX 1620 at 35–37; TX 1618 at 65–66; TX 1619 at 22–23, 101, 108). Warren, nevertheless, concluding that the Davis inventions were "an asset" which held commercial promise, paid an additional $20,000 at the end of the option period in order to acquire all rights to the Davis inventions (Tr. 916, 1980–84; TX 1620 at 35).

When Scott acquired Warren in 1967, Scott also acquired full title to the Davis patents in suit. (D.I. 113 at 5.)

### E. Moore's Quest To Develop A Commercially Acceptable Carbonless Copy System

On and off from 1938 Moore had an interest in developing a carbonless copy system (TX 5, 8, 10, 12). It was not, however, until 1954 that Moore hired Dr. Norman Macaulay to concentrate on developing a carbonless copy system to compete with NCR's patented CVL/BLMB system (Tr. 723–26). By coincidence, Dr. Macaulay's start in this endeavor coincided with Davis' investigation into the same field.

Dr. Macaulay, a Ph.D. chemist who had specialized in dyestuffs, spent about six months in 1954–55 investigating the scientific, technical and patent literature to determine the scope and content of the art which was available at that time. Macaulay completed his 167-page literature study in the second half of 1955 (TX 10), and it described numerous approaches to the problem of selecting suitable dye precursors for carbonless copy systems (Tr. 645–47, 726–76).

Macaulay's literature survey identified many of the NCR and other patents relied upon by Moore as prior art in this litigation (Tr. 152–53). These patents suggested using Michler's Hydrol itself, the methyl ether of Michler's Hydrol, and "thousands" of other chemicals, as colorless dye precursor candidates. Neither NCR nor anyone else has ever used Michler's Hydrol or the methyl ether of Michler's Hydrol in a commercially acceptable carbonless copy system (Tr. 727–28, 752–54, 757–59, 761, 768, 774–76, 1197, 2100–01).

Macaulay's survey included reference to publications such as Beilstein, Berichte, and Chemical Abstracts, but neither Macaulay nor the other Moore scientists who relied on the survey were led to the Hinsberg publications abstracted or reproduced therein (Tr. 736–40, 742, 746–47, 754).

After completing his literature study in 1955, Macaulay was "thoroughly conversant with the problems and the literature," so he began actual laboratory work to develop a carbonless copy system (Tr. 730–31, 770, 788–89; TX 8). He consulted with knowledgeable representatives of experienced dye manufacturing companies of the day, including National Aniline, Dye Specialties, DuPont, ICI, Lampson-Paragon, GAF, and the like. These companies shared their knowledge and expertise with Moore, and provided a wide variety of precursor candidates for evaluation by Macaulay and his colleagues, but with no success (Tr. 728–29, 768–808, 820, 823, 831–32, 835–37, 1384–90; TX 1639 at 60–62, 74, 78).

Macaulay's colleagues at Moore included Dr. George Baxter who joined Moore in 1957, Dr. Henn Ruus who joined Moore in 1958, and George Maalouf who joined Moore in 1963, plus a number of laboratory technicians who helped with their investigations and evaluations (TX 341 at 46; TX 340 at 69; TX 342 at 5).

Moore also retained several outside consultants to assist these scientists in their research efforts (Tr. 1381–84). One such consultant was Dr. Herbert A. Lubs, a renowned dye chemist who had retired from the DuPont Company in Wilmington, Delaware, shortly before Moore hired him as a consultant in 1965 (TX 51, 56 at 3.) For the next five years, Dr. Lubs met with the Moore scientists, principally Dr. Baxter, Dr. Ruus and Mr. Maalouf, at one month intervals. Dr. Lubs gave Moore many ideas to further the precursor investigations, and routinely provided copies of technical and scientific articles and patents (Tr. 814–20; TX 342 at 67–76).

On several occasions over the years 1955–1969, Moore's research efforts to develop a carbonless copy system reached the pilot plant stage. Each time, however, the system under development proved to be deficient and to have problems which could not be surmounted with the result that one approach after another was abandoned (Tr. 803–06, 1593–1601).

By 1969, fifteen years after Dr. Macaulay began his investigations, and thirty years after Moore first began its research, Moore's efforts still had not developed a marketable carbonless copy paper.

Over this long period, Moore had evaluated numerous combinations of clay and other coatings for the CF sheet, solvents, and in particular a wide variety of precursor candidates. Moore was never able to find a satisfactory combination, however, and it became apparent early in the program that the lack of a suitable colorless dye precursor was the serious "bottleneck" preventing success (Tr. 806, 838; TX 38): "our major problem is still fading of the color image"; (TX 39), "solving the color precursor bottleneck"; (TX 44), "Poor stability of the colored image ... has been the principal drawbacks"; (TX 90), "The lack of suitable color precursors is the bottleneck in getting our system into production"; (TX 59), "efforts to develop a functional product have been seriously hampered by ... our inability to acquire a color-precursor ... satisfying the many requirements demanded by the product"; (see also TX 21, 24, 26, 28, 30, 34, 37, 41, 42, 67).

The wide variety of precursor candidates investigated by Moore prior to 1969 included triphenylmethane dyes, derivatives of Indigo, indicators, phthalocyanines, coordination compounds, anthraquinones, metal complexes, azo dyes, and the like (TX 45, 49, 52, 60, 65).

Moore also evaluated Michler's Hydrol, the methyl ether of Michler's Hydrol, and many other derivatives of Michler's Hydrol (TX 116, 87, 107). The properties of these derivatives differed unpredictably, and they could not be successfully employed (id.). At one point in the mid-1960's, results were so discouraging that Moore abandoned investigation of derivatives of Michler's Hydrol altogether and as far as Moore could tell, they all had problems (Tr. 811–13, 817, 825–31).

At no time during the thirty year period between 1938 and 1969 did Moore's experts and researchers ever suggest using any sulfinate derivative of Michler's Hydrol as a key to solving the precursor "bottleneck" problem (Tr. 820, 859–62).

In 1969, B.J. Staneslow, Moore's manager of chemical research, gave a copy of the Davis 404 patent to Dr. Henn Ruus, who was then doing research on dye precursor candidates for Moore (TX 340 at 19–21, 28–31, 35–39). In October of 1969, following the teachings of the Davis 404 patent, Dr. Ruus made PTSMH, tested it, and soon found that it was the most "promising" precursor investigated in all the years preceding (TX 340 at 51). Further evaluations soon established that PTSMH was the precursor of choice for Moore (TX 340 at 19–20, 30–31, 51; Tr. 689, 702–03, 712, 839–46; TX 95, 96).

Moore's contemporaneous documents recorded that PTSMH was the best precursor available to Moore: (TX 108) PTSMH "is superior to the others"; (TX 111) "There can be no substitute precursor at this time that can be used"; (TX 129) "the best overall precursor"; (TX 87) "The sulfinates are the precursors most suitable for microencapsulation."

Dr. Ruus informed Dr. Macaulay or Dr. Baxter, Mr. Maalouf and Dr. Lubs in late 1969 that he had learned about PTSMH from the Davis 404 patent (TX 96, 340 at 42, 51). It is interesting to note, however, that on their depositions in early 1983 (before Scott had located Dr. Ruus and deposed him), Macaulay, Baxter and Maalouf all professed ignorance as to whether Dr. Ruus had learned of PTSMH from a Davis patent, or whether he had discovered it independently (Tr. 691–92, 700, 704; TX 341 at 162–76; TX 342 at 89–95).

F. *Moore Acquires License For The Davis Patents*

After Moore learned of PTSMH from the Davis 404 patent in late 1969, Moore decided that a license under the patent was necessary in order to use PTSMH commercially (Tr. 840–47, 861–63, 874–81, 1361–62, 1428; TX 341 at 194, 196–210; TX 111). At Moore's request, Dr. Lubs in early 1970 met with Davis at the Cincinnati Airport, but the meeting resolved nothing. Davis had a severe hearing problem, and Dr. Lubs was "an elderly man who had a bladder problem, and he had to keep running back and forth." It turned out each was talking about different things. Davis

thought Dr. Lubs was interested in rights to a completely different Davis invention (Tr. 217–19, 834–47; TX 101).

Dr. Lubs died shortly thereafter. Moore then sent Davis a copy of a proposed license. Only then did Davis realize that Moore was interested in the colorless dye salt 404 patent (Tr. 219–20, 874–75, 882–83). Davis immediately advised Moore that there had been a "hell of a mix-up" and that the dye salt patents had been assigned to Warren (Tr. 218–26).

Moore then contacted Warren in late 1970, and began negotiations for a license under the Davis 404 patent. Eventually, Scott (which by then had acquired Warren) granted Moore a license under the Davis 404 and 327 patents (TX 308). It took, however, almost two years of hard bargaining to finalize the royalty and other terms of the license agreement.

After Moore asked for a license (TX 178), Scott and Moore exchanged numerous proposals, counter-proposals, and revisions for a license under the Davis patents (Tr. 921–39; TX 178, 179, 182, 184, 185, 187, 197, 198). Moore consulted general lawyers as well as patent lawyers regarding the strength of the Davis patents, Moore's infringement of them, and the wording of the agreement (Tr. 1404, 1437–39, 877–78, 880–81, 926–27; TX 170, 182, 190).

There were also extensive negotiations with respect to an appropriate royalty rate and base. Moore proposed several different approaches, including basing the royalty on the amount of dye salt used to coat the paper, rather than the price of the recording paper itself, and redefining "net sales value" to reduce the royalties. Scott, on the other hand, insisted on basing the royalty on the net sales value of the recording paper to third parties (Tr. 1395–97, 1430–44, 884–89, 893–98, 1567–68, 926–38).

Robert Downie, Moore's Vice President and Director of Research, ascertained from Moore's accountants how much the royalties would be, projected on a yearly basis (Tr. 1434–35; TX 70, 180, 186, 202). Moore knew what the license would cost when Downie signed the agreement (Tr. 1399).

Ultimately, Moore agreed to pay royalties at the rate and on the basis originally suggested by Scott (TX 179), viz: 2% of the first $200,000 of the net sales value of all Recording Paper sold by Moore and 1% of the amount of the net sales value of Recording Paper in excess of $200,000 per year. Recording Paper was defined as paper which falls within the scope of the claims of the 327 patent (TX 308). Claim 11 of that patent, and of the 327/803 reissue patent, is representative. (D.I. 113 at 6, 8.)

Downie was the Moore executive who made both the decision to enter into the Scott-Moore license, and the decision a few years later to terminate it (Tr. 1360–62). He signed the final version of the agreement on June 12, 1972, but, "before the ink was dry" (Tr. 1397), and before the final agreement was signed by Scott on January 25, 1973, Downie began seeking royalty reductions. Scott rejected most of those efforts (Tr. 939–41, 903–05, 1397; TX 201, 202, 203, 207, 208, 209).

Moore proffered many excuses to obtain royalty reductions, including the need to facilitate Moore's internal accounting procedures, changes in the base papers Moore was using, and the Hinsberg publications (Tr. 245, 947; TX 210, 223). On several occasions Moore threatened to change from PTSMH to an alternate precursor not covered by the licensed Davis patents, so as to avoid royalties altogether (Tr. 952, 1394, 1415). Never, however, did Moore take the position that the patented inventions did not work, and Downie told Davis at a meeting in Boston in 1975 that "the patents worked perfectly" (Tr. 242, 1394, 1415, 1450–56, 947–50, 952, 954–55, 904–05; TX 197, 210, 222, 223, 1081, 1083).

Consistent with Downie's remark, Moore promoted its Moore Clean Print (MCP) carbonless business forms made under the Davis patents as "the greatest advance in carbonless paper in decades" (TX 1670; Tr. 2064; TX 421, 1671). Moore extolled the virtues of its MCP business forms, "best of all, it allows you to keep hands, clothing

and work surfaces clean" (TX 1091, col. 5, lines 13–14; TX 1094, 1670; Tr. 2064), and they produce "a clear, crisp image that actually intensifies with age." (TX 1673; Tr. 64, 67, 2072; TX 1673.)

Moore's sales of MCP business forms increased substantially each year starting in 1972 as reflected in the royalty payments made to Scott. These royalty payments through mid-1976 amounted to $563,-215. (TX 219, 420.)

## G. *Moore Terminated The License Agreement In 1976*

Downie negotiated and signed the Scott-Moore license because he had been advised by Moore's technical personnel that they had to use PTSMH in MCP (Tr. 873, 1602–04, 1362), and by Moore's counsel that MCP paper containing PTSMH infringed the Davis claims (Tr. 1404–07, 862, 878–81; TX 170). Downie obligated Moore to pay royalties on the sales of MCP business forms because "we wanted to start swimming" (Tr. 1328), but he did not expect to pay significant royalties as sales increased because he "didn't expect to continue using PTSMH" (Tr. 1400, 1392). Downie thought that PTSMH could be quickly replaced with a non-infringing black imaging precursor (Tr. 1328, 1399–1400).

Downie viewed Scott as nothing more than a "supplier" which enabled Moore to use PTSMH in MCP for a year or two and that the royalty was just a "component" in the cost of the finished product (Tr. 1403). Downie's wish was to reduce costs (Tr. 1402, 900–01).

When the hoped-for black precursor sought by Moore could not be developed as planned, and the royalties to Scott increased, the "pragmatic" Downie (Tr. 1326) first tried several ways to reduce the royalty "costs." After Scott refused to grant concessions of the size demanded by Downie (Tr. 1326, 1452–55; TX 213), Downie made what he repeatedly characterized as a "commercial" or "business" decision (Tr. 1452). He simply refused to incur further "costs," i.e., to pay any further royalties (Tr. 1461; TX 232). Although Downie terminated the license agreement, Moore continued to sell MCP business forms using the Davis inventions (Tr. 1462–63).

At the time Moore terminated the license agreement and refused to pay royalties after June 30, 1976, it asserted the Hinsberg publications as the excuse for its actions (Tr. 1402; TX 1079). On the other hand, Scott considered the Hinsberg assertion as "Downie's ploy to get a royalty reduction" (TX 1079; Tr. 948). In later discussions with Scott, Downie confirmed that a royalty reduction was what he really sought (TX 1080, 1083; Tr. 948, 1402, 1461).

Downie testified that Moore's patent counsel had advised him that the Davis patents were invalid in view of Hinsberg (Tr. 1409–10). Although Scott has alleged wilful infringement since 1977 in its pleadings, Moore has never offered any such legal opinion in evidence, claiming privilege and blocking discovery. The record does not support the existence or content of such opinions, or reveal what information may have been supplied by Moore on which they were based.

Downie had read the 1897 and 1917 Hinsberg articles before he terminated the license with Scott (Tr. 1407). He knew that although the Davis patents claimed colorless copy systems, paper coated with chemicals, methods of printing, and manifold sheets, none of these were taught in the Hinsberg publications (Tr. 1407–08; TX 1639 at 114, 118–119; *see also* Tr. 1607–08).

Downie also knew that merely because a chemical changed color did not mean it could be used as a precursor, because precursors in carbonless systems had to possess many demanding properties (Tr. 1372–78; TX 1639 at 65–73). There is nothing in the record to suggest that Moore's counsel in 1975–76 were ever informed of the many property demands on a color precursor, or of other key facts relevant to validity, such as Moore's long search for suitable precursors and its utter failure until it learned of the Davis patents.

At the time Downie ceased paying royalties in 1976, he "made a business decision" and "never changed it" (Tr. 1412). He later learned that Scott had gone back to the PTO and that the PTO considered Hinsberg (Tr. 1410). Downie also knew that the PTO found claims in the Davis patents covering MCP to be patentable over Hinsberg and Beilstein (Tr. 1411; TX 1639 at 127–131). The PTO rulings adverse to Moore did not in any way change Downie's decision to terminate the license (Tr. 1410–13). It did not change his mind at all, because "I thought I was right the first time; after I examined it, I still considered I was correct"; "I re-examined my business judgment and felt the same, that it was unchanged"; "I gave my best business judgment, and I reaffirmed my business judgment" (Tr. 1410–13, 1422–25). The PTO's rejection of Moore's invalidity arguments in the reissue proceedings was simply dismissed by Downie, "The Patent Office had, in my opinion, been wrong the first time. There is no reason they shouldn't be wrong the second time." (TX 1639 at 129.)

The Court is convinced that Downie's decision to terminate the license was based on the fact that the royalties increased too much and that Moore was not capable of developing the alternate precursor as Downie had contemplated (Tr. 1572–74). The citation of Hinsberg in terminating the license was nothing more than a colorable excuse for a "business" expediency in an attempt to disregard Scott's patent rights. Downie "made an estimate of the cost of litigation," then "looked at the thing from a commercial point of view and decided to stop paying the royalty" and that was "the commercial decision that I took in stopping payment on the patent." (Tr. 1355; TX 1639 at 110, 131.)

At the time Downie stopped paying royalties, he was "unconcerned as to what Warren's next move or step or reaction would be" (Tr. 1422–25). Downie believed that the imminent development by Moore of a black precursor would minimize the extent of any problem with Warren (Tr. 1424). This, however, was no excuse for terminating the license and continuing infringement (Tr. 1589–90).

Moore scientists worked assiduously on alternative precursors, but they were unable to perfect a commercially acceptable system to use in place of PTSMH until the Davis patents expired. Moore accordingly was forced to continue using PTSMH in its MCP business forms in wilful disregard of the Davis patents, and to do so for the remaining life of the patents (Tr. 1532, 1351; TX 343 at 3–5, 10–11, 23–26, 31–32, 38, 42–44, 61–64; D.I. 113 at 7).

Moore carried out its threat (TX 232) and refused to make the royalty payment for the third calendar quarter of 1976, which fell due at the end of October. This was clear confirmation of Moore's election to terminate the Scott-Moore license agreement under the applicable termination provisions, based on the asserted default by Scott.

## H. *Suit Brought And The PTO Reissue Findings*

Scott brought this suit against Moore a few months later in May of 1977. (D.I. 1.) Shortly after this action was filed, Scott learned for the first time of Davis' 1955 and 1957 patent applications. Scott promptly filed applications to reissue the Davis 327 and 404 patents then in suit, in order to claim the benefit of the filing dates of the 1957 recording paper application and both of the 1955 applications. (TX 300 at 5, 73, 75; TX 301 at 5, 75, 77.) As before mentioned, the reissue proceedings at the PTO required more than four years, and the two reissue patents in suit were granted to Scott in November of 1981 (Tr. 264, 993; TX 300, 301, 1090, 1091).

Under the so-called "Dann amendments" in effect in the reissue proceedings at the time, Moore actively participated as a protester throughout the reissue proceedings. Moore presented evidence, and factual and legal arguments, to the effect that reissue patents should be refused on the basis of: (1) Davis' 1955 efforts to sell the rights to develop his inventions; (2) the Beil-

stein/Hinsberg prior art; (3) the statement concerning the solubility of BSMH; and (4) Davis' fraud and inequitable conduct (Tr. 984–1002; TX 300 at 412–62; TX 301 at 292–344).

· The PTO reissue file of each application exceeds 1,000 pages, in large measure because of the volume of evidence presented by Scott/Davis for consideration, and the PTO's careful evaluation of it, and of Moore's submissions and arguments. The voluminous files were explained and summarized at trial by John F. Witherspoon, Scott's expert and a former member of the Board of Appeals (Tr. 978). When he characterized the reissue prosecution as "very thorough and extensive," this Court agreed, "You don't have to say any more. Of all the reissue applications I have seen, I have never seen one so complete." (Tr. 1107–08.) [8]

The primary reissue Examiner, James R. Hoffman, thoroughly considered and rejected Moore's protest that the Davis patents should be barred because of Davis' early efforts to interest others in developing his invention and to sell rights in his inventions for that purpose.

The background facts in connection with Davis' early activities were presented to the PTO by means of a first Declaration, with extensive exhibits (Tr. 1015–16; TX 301 at 79–287). Moore responded with a "Protest to Reissue" which set forth the grounds upon which Moore initially protested the grant of any reissue patent (Tr. 1019–23; TX 301 at 293–316). Moore, citing elaborate facts and legal authority, included a section specifically asserting that the Davis patents were invalid as being "on sale" in 1955. (TX 301 at 306–309.)

Davis filed two more Declarations, which attached additional exhibits concerning his activities in 1955–59 (TX 301 at 483–523, 742–850). Moore filed responses, which contained extensive arguments on alleged public use, sale, and/or offer to sell by Davis in 1955–59 which Moore contended barred any reissue (TX 301 at 544–46, 860–69).

At trial, Davis confirmed the truthfulness of all his reissue Declarations (Tr. 258–61), and Moore had a full opportunity to cross-examine Davis concerning them.

Examiner Hoffman carefully considered the issue "whether Davis undertook any activity during the critical period which could be construed as placing the invention on sale or in public use" (TX 301 at 940). After reviewing all the evidence, the Examiner noted that he had "read all of the cases cited by the protestor as well as the cases cited by the Commissioner.... Additionally, he has made his own search of the case law." (TX 301 at 941.) In every case cited in which a "public use" or "on sale" bar was found, "without exception, the inventor has sold, attempted to sell, or publicly used the invention defined in the claims of his patent." (*Id.*) "No case has been found where any court has found that the *invention* was in public use or on sale solely as a result of the inventor's sale or attempted sale of the *rights* to his invention or as a result of his demonstrating the invention to prospective purchasers of such rights" (*id.* at 942; Tr. 1091–92, 1094–95, 1097–1100, 1150–52, 1159–60; TX 300 at 1035–36).

Examiner Hoffman thus concluded that there is "not even a hint" of evidence indicating that patents should be barred by Davis' early activities:

> The activities of Davis shown on the record of this application are not the kind of activities which could give rise to a "public use" or "on sale" bar under 35 USC 102(b). There is not even a hint of a *prima facie* case that Davis either publicly used or placed on sale the invention claimed in this application prior to one year before the effective filing date of any claim.

(TX 301 at 945; *see also* TX 300 at 1039.) [9]

When Scott filed the reissue application, it also provided the PTO with copies of the 1897 and 1917 Hinsberg publications, together with English translations (TX 301 at

---

8. The Court adheres to this conclusion stated at trial.

9. Examiner Hoffman in an earlier action had found Davis' early activities "were primarily for

34–62). In its "Protest to Reissue," Moore argued that Hinsberg precluded the reissuance of any patent claims (TX 301 at 295–303).

Examiner Hoffman proceeded to analyze the Hinsberg publications in detail, and concluded that Hinsberg was "not material to the patentability" of the 327 patent claims in issue:

> The Hinsberg references are somewhat relevant to the invention claimed in this application since Hinsberg disclosed compounds which might be used in the claimed invention. However, since each claim in this application is directed to a coated substrate and Hinsberg does not suggest applying the disclosed compounds to a substrate nor does he suggest any utility for them whatsoever, Hinsberg does not provide basis for rejection of any claim under either 35 USC 102 or 35 USC 103. Thus Hinsberg is not material to the patentability of the instant claims.

(TX 301 at 401.)

Examiner Hoffman also concluded with respect to the 404 patent claims 1–5 and 10 that "there is nothing in the Hinsberg disclosure which could possibly suggest to one of ordinary skill in the art that the materials he discusses could be used in a printing process" (TX 300 at 524).

The Examiner accordingly allowed claims from both of the original Davis patents, including representative claims such as claim 11 of the 327 patent, and claim 10 of the 404 patent.

Moore contended at trial that the last part of the single sentence which appears in the 404/797 reissue patent (TX 1090), col. 3, lines 15–19), but which does not appear in the 327/803 reissue patent (TX 1091), was in error. That sentence acknowledged: "The only known member" of the Davis dye salts, BSMH, and stated that it "is completely insoluble at room temperature in the usual solvents used in recording

systems." Moore's arguments concerning the solubility of BSMH were made to the PTO during the reissue proceedings. Moore contended that BSMH was soluble in solvents such as benzene, and made certain (with capital letters and underlining) that the reissue Examiner could not miss Moore's point, "Davis is DEAD WRONG" (TX 300 at 635).

Moore also presented demonstrative exhibits to the PTO which consisted of CF and CB sheets, contained in eight separate envelopes, allegedly to prove that BSMH is soluble "in benzene or any solvent useful for the production of carbonless copying systems" and that it also has color forming properties (TX 300 at 636–39, 647–54, 785–90, 948–51). These eight envelopes and their original contents were admitted at trial (TX 1657–1664).

The reissue Examiner nevertheless held in the next Office Action that "Moore has been unable to produce even the slightest bit of documentary evidence that any person of ordinary or even extraordinary skill would have ever thought of utilizing" the sulfinates of Michler's Hydrol "in a printing process prior to applicant" (TX 300 at 657).

These same arguments regarding solubility were emphasized by Moore repeatedly throughout the trial of this case, principally through the testimony of Dr. William J. Bailey and the video testimony of Nancy Mitchell. Their testimony, however, which tends to show that BSMH can be dissolved in benzene and other solvents and produce a blue color on clay, adds nothing to the evidence presented to, considered by, and rejected by, the PTO in the reissue proceedings.

In addition, throughout the reissue proceedings Moore contended that Davis was guilty of fraud and inequitable conduct in connection with the prosecution of the applications leading to the original Davis 327 and 404 patents (TX 300 at 414–22, 749–70,

---

the purposes of experimentation" and thus would come within the experimental use exceptions to the "on sale" bar. (TX 300 at 404–05, 552.) But in his later action on November 11, 1977, the Examiner stated that the "experimen-

tal use exception" need not be invoked because there was no *prima facie* showing that the Davis inventions were "in public use or on sale in this country, more than one year prior to the date of application." (TX 301 at 937–38.)

785–87, 947–66, 1014–20, 1047–66). Specifically, Moore claimed (1) that Davis had withheld documents and information regarding his "on sale" activities which he should have known were material to the examination of the patent applications, (2) that he failed to specifically disclose the Beilstein publication, which he admittedly knew about, and the Hinsberg publications which Moore asserted he must have known about, and (3) that he had falsely described the solubility of BSMH.

Davis has consistently maintained in his reissue Declarations, on his deposition, and at trial that he never read the Hinsberg publications until Moore brought them up in connection with the Scott-Moore license, long after the original patents issued. This is completely understandable because the Beilstein reference to BSMH, erroneous as it was, provided all the information of interest to him (Tr. 85, 249–50, 262, 355, 614; TX 1665, Vol. 3 at 345; Vol. 4 at 546, 569; Vol. 5 at 9, 19).

The issue of Davis' allegedly inequitable conduct was also submitted to the Assistant Commissioner of Patents for resolution and in a thoroughly reasoned and comprehensive decision, the Assistant Commissioner concluded that the applications should not be stricken for fraud as Moore demanded:

> For the reasons given above, the record of these reissue applications is not clear and convincing that any fraud was practiced or attempted on the Office or that there was a violation of the duty of disclosure through either bad faith or gross negligence so as to warrant striking these applications under 37 CFR 1.56(d).

(TX 301 at 986–98.)

## III. VALIDITY AND ENFORCEABILITY

### A. *The Issue of Obviousness*

Moore contends here, as it did in the reissue proceedings before the PTO, that the evidence clearly establishes that the Davis patents and reissue patents are invalid because they would have been obvious to a person having ordinary skill in the carbonless copying art in 1955 to use prior art sulfinates of Michler's Hydrol for color formers used or described for use in the NCR carbonless systems. The Court disagrees.

■ Obviousness under 35 U.S.C. § 103 is a conclusion of law based upon fact determinations. As set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966), and in *Stevenson v. International Trade Comm'n*, 612 F.2d 546, 549 (CCPA 1979), those fact determinations involve: (1) the scope and content of the prior art; (2) the differences between the prior art and the claimed invention; (3) the level of ordinary skill in the pertinent art; and (4) additional evidence, which may serve as indicia of non-obviousness. *Environmental Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 695 (Fed.Cir.1983), *cert. denied*, — U.S. ——, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984).

### 1. *Scope And Content Of The Prior Art*

In developing its contention of obviousness, Moore's expert, Dr. Herbert Rance, cited as pertinent prior art (Tr. 2015, 2023, 2027, 2006–07) to two Hinsberg publications, one in 1897 (TX 1615) and the other in 1917 (TX 1616), Beilstein (TX 1617), and five NCR patents: Adams, 2,417,897 (TX 1552), Green 2,505,470 (TX 1553), Davis 2,646,367 (TX 1143 at 19–20), Green 2,712,-507 (TX 1621), and Green 2,714,074 (TX 1554).[10] The purpose for the citation of these NCR patents by Moore is for the proposition that these references teach only limited classes of precursor candi-

---

**10.** It must be noted that each of these patents and publications were considered by the PTO during the reissue proceedings when Moore asserted each to render the Davis inventions obvious. The PTO nevertheless held this prior art did not reflect adversely upon Davis' reissue claims at issue in this action. (Tr. 1007–09, 1012–15 and TX 301 as follows: Hinsberg 1897 at 56–62, 378–381; Hinsberg 1917 at 35–43, 52–54; Beilstein at 369–371; Adams '897 at 65, 74; Green '470 at 65, 71, 74, 534; Green '507 at 66,

dates, plus properties needed for colorless precursors, and therefore these teachings lead inevitably to Davis' inventions. The creditable evidence, however, belies Moore's proposition. The NCR patents do not teach only a limited class of Michler's Hydrol derivatives as useful candidates for colorless precursors but rather a "huge" number of materials. (Tr. 1173–74, 1179–80, 1182, 2084, 2108–10.) In corroboration of this is the fact that Moore knew of the NCR patents by 1955 (TX 4 at 1679–83, 1686; TX 10 at 6003), but did not consider the potential color precursors were so restricted (TX 10 at 5898–5926; TX 65). But even assuming for purposes of argument that NCR art effectively limited the choices of precursor candidates to Michler's Hydrol derivatives, this class included thousands of individual compounds of widely varying properties, and there is no suggestion in the NCR patents that, of the large number of possibilities, the sulfinates of Michler's Hydrol would be useful and practical colorless precursors.

The exact number of chemicals in the class of Michler's Hydrol derivatives is a "matter of definition." The widely differing views as to the scope of this class are illustrated by the dispute which arose at trial whether CVL (taught in the NCR patents) is or is not a derivative of Michler's Hydrol. Drs. Macaulay and Vassiliades testified it was *not* (Tr. 642, 1194–96), while Drs. Bailey and Rance testified it *was* (Tr. 1783–84, 2105). Some chemists limit Michler's Hydrol derivatives to compounds derived from a single step chemical reaction employing Michler's Hydrol as one of the starting materials. Other chemists expand the class to include any compound made from Michler's Hydrol, regardless of the number or complexity of the steps involved (Tr. 1194–96, 1782–84, 2104–08).

Nevertheless, even the most restrictive definition of Michler's Hydrol derivatives, compounds made in a single step from Michler's Hydrol, still embraces "thousands of possibilities" (Tr. 1194–96, 1780–81). The broader definition includes an even

greater number of candidates (Tr. 1196, 1783).

Thus, within these thousands of possibilities, each type of Michler's Hydrol derivative displays different and unpredictable properties. The suitability of each for use in colorless copy systems differs widely. This is true even of derivatives which change color and produce the same colored cation (Tr. 890, 1728, 1856–59, 812–13; TX 87, 116).

To the extent that precursor choice is guided only by Michler's Hydrol or its methyl ether derivative as Moore contends, both specifically identified in the NCR patents, failure is inevitable. Neither possesses the requisite properties to make it useful in a practical system (Tr. 1196–97, 680–83, 1727–30, 2100–01). Moore's scientists have publicly asserted these property deficiencies, including discoloration, ghosting and blushing; and Dr. Rance admitted the same (TX 1155, col. 9, lines 28–29 and col. 13, lines 24–25; Tr. 2113). Thus, Moore's heavy reliance on these specific compounds in support of obviousness is undermined by Moore's prior admissions.

With respect to the few superficial properties of precursors selected by Moore as the foundation of its obviousness defense (e.g., D.I. 188 at 23), each was specifically mentioned in the Davis and Thacker and the Compton patents, together with specific reference to CVL, Michler's Hydrol and its methyl ether. These patents were expressly considered during the reissue proceedings (TX 301 at 401–02, 409–10; TX 1143 at 19–24 (Davis and Thacker), col. 1, lines 4–5, col. 2, lines 4–10, col. 4, lines 55–63, col. 6, lines 47–51 and claim 1). The reissue examiner specifically rejected Moore's arguments based on these NCR patents, noting that the inventions were not obvious to "any person of ordinary skill or even extraordinary skill" (*compare* TX 301 at 530–37 *with* 552–53). This Court agrees with the patent examiner.

Moore also contends that because Davis referred to Beilstein in the development of

his inventions, he would have been inevitably directed to the Hinsberg articles which would have taught an ordinarily skilled man in the art that BSMH, a derivative of Michler's Hydrol, possessed all the key properties that the NCR patents taught should be possessed by many available color performers (Tr. 1787, 1790–94, 2118–85).

Beilstein is an index, written in German, which briefly summarizes many other technical publications (Tr. 1218–19). It comprised about one hundred volumes by mid-1954 and if stacked, would stand at least 10 feet high (Tr. 83–84, 1784–85, 2117–18). A chemist does not start reading Beilstein randomly without some definite preconceived idea of a particular chemical in mind, because Beilstein is arranged by chemical name or empirical formula, and not by end uses (Tr. 82–94, 1787–89, 1794–95, 2117). Indeed, many compounds with no utility are included in Beilstein (Tr. 1789–90).

The pages from Beilstein relied on by Moore provide a compendium of compounds which share a common chemical structure (Tr. 1219, 1795). One of the many compounds in the listing is Michler's Hydrol, and Beilstein describes how to make it, its physical properties, and some of its chemical reactions (Tr. 1219–20, 1798–1800). Ten pages of Beilstein are devoted to reactions and reaction products of Michler's Hydrol (Tr. 1220–21, 1805–06). A very large number of different chemical reactions involving Michler's Hydrol are described (Tr. 1221). Over eighty-five individual Michler's Hydrol derivatives are identified (Tr. 1221); and, in addition, thirteen generic classes of such derivatives are described and the investigation and exploration of any one of these classes would consume a substantial amount of time (Tr. 1222, 1807–26). There are "millions" of Michler's Hydrol derivatives within the Beilstein pages relied on by Moore (Tr. 1823).

Beilstein notes numerous instances where colors appeared under different conditions, and a substantial number of the Michler's Hydrol derivatives are called "Leuco's" (Tr. 1223, 1796–98, 1807–26).

Leuco indicates that a compound is useful in the field of dyes and dyestuffs (Tr. 729–30, 1213). Beilstein identifies both of the 1897 and 1917 Hinsberg articles at page 8, but this reference to Hinsberg is devoid of any indication of color formation, or of any Leuco compounds (Tr. 1222–23, 1814).

At pages 18–19, Beilstein again identifies the 1897 and 1917 Hinsberg articles. Although the appearance of color is mentioned (a blue color appears in hot diluted mineral acids), there is nothing in the description of Hinsberg which singles out this appearance of color from the myriad other color changes found in Beilstein, and the reaction product of Michler's Hydrol and benzene sulfinic acid is not characterized as a Leuco compound (Tr. 1224–25, 1829).

Hinsberg's 1897 publication (TX 1615) discusses the preparation of compounds called sulfones by reacting benzene sulfinic acid with Michler's Hydrol (Tr. 1202). Hinsberg was not concerned with any practical or other use for the resulting sulfones because he simply carried out the reaction, and then theorized what the structure of the resulting compound might be. His paper is entirely academic or theoretical in nature (Tr. 1202, 1830–32, 1604–07). While Hinsberg's proposed structure was incorrect, all witnesses agreed that the compound actually prepared was BSMH.

Hinsberg made BSMH by reacting equivalent amounts of the starting materials and then recrystallizing the resulting product from benzene (Tr. 1204). Hinsberg's use of benzene as the recrystallization medium, and his express statement that the reaction product was soluble in "hot benzene," indicates to chemists reading his article that the final product was insoluble in benzene at room temperature (Tr. 1204–06, 1240–44, 1848–55).

Hinsberg also stated that color appeared under certain limited circumstances, namely, when heating BSMH in glacial acetic acid or with dilute mineral acids (Tr. 1206), but these acidic solutions could never be used in carbonless copy systems (Tr. 1218, 756).

Hinsberg published his second article in 1917. It was directed to the same reaction he had examined 20 years earlier in 1897 (TX 1616). In 1917, Hinsberg revised the structure of BSMH he had originally proposed (Tr. 1203–04, 1206–09, 1834–35); but, otherwise, the nature of the information provided was the same theoretical teaching devoid of any stated use for BSMH (Tr. 1206–06).

As he had noted in 1897, Hinsberg in 1917 mentioned the appearance of color under certain environmental circumstances, but again ascribed no significance to the color (Tr. 1212–13, 1218). The 1917 article also characterizes some of the described chemicals as "Leuco" compounds, but it is significant that BSMH is not so identified (Tr. 1213–15, 1218).

## 2. *Level Of Skill In The Art In 1955*

■ Factors to be considered in determining the level of ordinary skill in the art include: (1) the educational level of the inventor; (2) the type of problems encountered in the art; (3) the prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) the sophistication of the technology; and (6) the educational level of active workers in the field. *Environmental Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696 (Fed.Cir. 1983); *Orthopedic Equipment Co., Inc. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–82 (Fed.Cir.1983).

Not all these factors may be present in every case, of course, and one or more of these or other factors may predominate in a particular case. *Environmental Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d at 696.

The person having ordinary skill in the art of selecting colorless precursors for carbonless copy systems in 1954 possessed a degree in chemistry, plus an advanced degree and perhaps a Ph.D. degree, had some knowledge of dyes and dyestuffs, and was generally familiar with the patent and technical literature relating to carbonless copy systems. Examples of such individuals are: (1) advanced degree graduates with a background in dyes and dyestuffs who worked in-house and had studied the pertinent literature, such as Davis and Moore's Dr. Macaulay (Tr. 642–43, 646, 770); (2) outside consultants with a similar background such as Moore's Dr. Lubs (Tr. 814–19); (3) the NCR scientists and inventors (Tr. 54); and (4) employees of established dye manufacturing companies such as DuPont, National Aniline, Dye Specialties and the like, who were knowledgeable about color forming materials and worked with companies such as NCR and Moore to provide dye precursor candidates for possible use in carbonless copy systems (Tr. 1173–75, 2085–2100, 1381–90; TX 301 at 415–16).

Persons of ordinary skill in this art knew very well by 1954 that the mere formation of color when organic compounds react, or are subjected to different environments, was a "very common" everyday occurrence (Tr. 1194, 1217). Such color changes provided the basis of magic tricks, and they were so routine that it would be very difficult for a color-blind person to be an organic chemist. As of mid-1954, skilled workers knew there were literally thousands of materials in organic chemistry that changed color under some circumstances (Tr. 1778–79). Many of these compounds were known to be useful as dyes or dyestuffs. Dr. Macaulay, in his 1954–55 literature study (TX 10), which formed the basis for Moore's subsequent MCP research, uncovered "hundreds and thousands" of such compounds (Tr. 727–28, 731–32, 748–50, 761–69, 826–31).

Persons of ordinary skill in this art also knew by 1954 that colorless precursors for carbonless copy systems must meet many demanding standards and that it was not enough that the candidate merely change color under some conditions (Tr. 1193, 1217, 1377–80, 735). Illustrative of the complex properties required are: stability to light, aging, temperature, chemicals, oxidation, heat, and humidity, in both the colorless and colored forms; immediate image formation; non-staining to skin and clothing; solubility in the carrier; inertness to pro-

cessing; and, negligible vapor pressure (Tr. 1182–88, 2101–04, 2110–14, 1372–77, 736–37). These and other essential but elusive properties were specifically recognized in the Davis patents (Tr. 1188–93; TX 1090 and 1091).

The level of ordinary skill in the art of colorless precursors for carbonless copy systems by 1954 was typified by the NCR experts, and by Moore's scientists and consultants, all of whom were actively seeking ways to improve on the CVL/BLMB system commercialized by NCR. All of the prior art which Moore contends made the Davis inventions obvious was available to these skilled workers for decades. It was only Davis, however, who discovered the sulfinates of Michler's Hydrol as useful precursors in carbonless copy systems.

### 3. *Difference Between Prior Art And The Claimed Inventions*

■ The test is whether the claimed invention, considered as a whole, would have been obvious or nonobvious at the time it was made. *Jones v. Hardy*, 220 U.S.P.Q. 1021, 1025 (Fed.Cir.1984); *Schenck v. Nortron Corp.*, 713 F.2d 782, 785 (Fed.Cir. 1983). Patent claims are not to be dissected to ascertain some purported "gist" or "kernel" of the invention, and failure to consider the claimed invention as a whole is an error of law. *Jones v. Hardy*, 220 U.S. P.Q. at 1025; *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1548 (Fed. Cir.1983).

When the inventions claimed in the Davis patents, such as claim 11 of the 327/803 reissue patent and claim 10 of the 404/797 reissue patent, are considered as a whole, the differences over anything disclosed or suggested in the prior art relied on by Moore are fundamental. The NCR patents admittedly disclose, with reference to claim 11 of the 327/803 reissue patent, "A transfer sheet having upon its surface a coating containing ... substantially colorless" compounds. They also disclose with reference to claim 10 of the 404/797 reissue patent a "method of printing which comprises applying to a surface [such as clay] a substan-

tially colorless" compound. Neither the NCR patents nor the Beilstein/Hinsberg publications, however, disclose such transfer sheets or printing methods using either the sulfinates of Michler's Hydrol generally, or PTSMH specifically, as the substantially colorless compound.

Davis has acknowledged from the outset that BSMH was a "known" composition but "a new use of a known ... composition" is a specifically approved subject matter for a valid patent, 35 U.S.C. §§ 101 and 102.

Moore's contention that Beilstein/Hinsberg made it "obvious to try" BSMH is not supported by the facts, and is erroneous as a matter of law. *Jones v. Hardy*, 220 U.S.P.Q. at 1026; *Application of Antonie*, 559 F.2d 618, 620 (CCPA 1977).

### 4. *Objective Indicia Of Non-Obviousness*

■ Objective indicia of non-obviousness, when present, must always be considered before a legal conclusion under 35 U.S.C. § 103 is reached. *Jones v. Hardy*, 220 U.S.P.Q. at 1026; *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir.1983). Thus, evidence rising out of the so-called "secondary considerations" are always pertinent when attempting to make a judgment of obviousness. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d at 1538; *In re Sernaker*, 702 F.2d 989, 996 (Fed.Cir.1983). Such evidence includes commercial success, filling a long felt need, failure of others to solve the same problem, praise of the invention, and the like. *Rosemount, Inc. v. Beckmann Instruments, Inc.*, 221 U.S. P.Q. 1, 7 (Fed.Cir.1984). Indeed, such evidence is often the most probative and cogent evidence of non-obviousness in the record. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d at 1538.

This is particularly true in the present case. Absent the hindsight of Moore's expert, Dr. Rance, there is no indication that the prior art in fact provided the "key to unlock that mystery." *Studiengesellschaft Kohle, m.b.h. v. Dart Industries, Inc.*, 726 F.2d 724, 727 (Fed.Cir.1984).

Although neither Scott nor Davis had the burden of proving non-obviousness, the record in this case contains a wealth of evidence, set forth in the findings of fact above, which objectively establishes that the Davis inventions were not obvious in 1955 to a person of ordinary skill in this art. NCR's experts who were searching for improved carbonless copy systems since at least the mid-1930's, never discovered the unique utility of the sulfinates of Michler's Hydrol.

Dr. Macaulay, his fellow scientists at Moore, Moore's outside consultants, including Dr. Lubs, and the leading dyestuff manufacturers at the time, spent more than 30 fruitless years attempting to develop a superior carbonless copy system. They investigated a vast number of color formers during this time, including numerous derivatives of Michler's Hydrol, but it was not obvious to any of them that the sulfinates of Michler's Hydrol had unique and superior properties.

When Moore finally learned about PTSMH in 1969, it was not through the systematic scientific investigations of its experts, consultants, and assistants, but through the Davis 404 patent.

At the time Downie signed the Scott-Moore license, PTSMH was admittedly the best precursor available to Moore. It became one of only three basic precursor systems used commercially before the Davis patents expired (Tr. 2077–78). Moore adopted PTSMH for its MCP, but continued to seek alternate color precursors which would be outside the scope of the Davis patents and thus avoid the royalty payments. Moore's inability to devise an alternate precursor during the life of the Davis patents, despite its background of research, highlights the unique and non-obvious nature of the Davis inventions.

The patent license which Moore sought from Scott is itself a tribute to the merits of the Davis inventions. Moore paid more than $500,000 in royalties during the initial four years, before it elected to terminate the agreement for "business" reasons at a time when the royalties for the following

year alone (1977) would have been more than all the royalties paid to Scott in the initial four years. (D.I. 113, ¶ 17, p. 10.)

Moore netted more than $750 million from the sale of MCP business forms using PTSMH (D.I. 113, ¶ 16, p. 9) over the life of the patents, leaving no doubt of the merit and importance of the Davis inventions.

Moore also presented all of its obviousness arguments based on the NCR patents and the Beilstein/Hinsberg publications to the PTO during the reissue proceedings. The reissue Examiner after endlessly considering the prior art and Moore's arguments, determined that the subject matter of the Davis patent claims in issue would not have been obvious to a person of ordinary skill in the relevant art at the time Davis made his inventions.

■ Based upon the creditable evidence adduced at trial and the reasonable inferences arising therefrom, this Court concludes, as did the PTO in the reissue proceedings, that the Davis inventions were not obvious and that Moore has totally failed to meet its conceded burden of proving the invalidity of the Davis patents under 35 U.S.C. § 103 by clear and convincing evidence.

### B. *The "On Sale" Issue*

Before the PTO (TX 301 at 306–09) and in the Pretrial Stipulation in this action (D.I. 113 at 20), Moore contended that Davis' efforts in 1955 to sell his patent rights to a number of companies, as found above, rendered his patents invalid under the "on sale" or "public use" bar of 35 U.S.C. § 102(b). Moore, however, in its post-trial brief has abandoned its earlier assertions in this regard as to Davis' dealings with other companies, and now only urges that Davis' grant of an option to McBee Company amounted to an invalidating "on sale" bar. (D.I. 188 at 69–71.)

Moore specifically points out that on September 12, 1955, Davis, in consideration of McBee's payment of $15,000, executed an option and agreement granting "the exclusive option and right to purchase from Da-

vis all the entire right, title and interest in and to the inventions of Davis aforesaid and any and all improvements thereon and uses thereof heretofore or hereafter made or conceived by Davis and any and all patents which may be obtainable thereon in the United States and all other countries of the world" (TX 300 at 151). The initial option period was for four months—from September 12, 1955 to January 13, 1956 (*id.* at 152). The option further provided that McBee was "to conduct during the option period only, a program of research and testing to determine whether said inventions are commercially practicable" and that "such testing may include some actual commercialization of the inventions to test customer acceptance and product performance under actual use conditions." (*Id.*) The agreement also provided that McBee could extend the initial four-month option period to January 13, 1957 by paying Davis $25,000 if it elected to extend the option period before January 13, 1956. (*Id.*)

 Moore argues that, since the option and agreement divested Davis of all control over the commercialization of his inventions more than a year prior to the effective filing date, the patents are invalid under 35 U.S.C. § 102(b). The Court disagrees. What was actually done under the Davis-McBee agreement is of greater importance than the written language relied upon by Moore. The facts show that the agreement provided for a "program of research and testing" (*id.*) and that was *all* that was ever done in the four month option period. McBee never extended the option. During the four-month period, Davis worked with McBee's employees in a locked research room "in privacy" and Davis and McBee understood that McBee would keep the inventions secret. While the testing contemplated that it "*may* include some actual commercialization of the

inventions," McBee never attempted such "commercialization" at any time (Tr. 161–67). Indeed, "commercialization" was an "impracticability" within the option period unless the McBee people had been "miracle workers" (Tr. 577). When the four-month option period ended, McBee elected not to extend the option and it returned to Davis all the test samples that McBee had made, the copies of the patent applications, and all other documents. Neither Davis nor McBee ever made any product for commercial sale or sold any product to test customer acceptance (Tr. 161–67, 574–78). Under the facts of this case, the "on sale" bar is not applicable. The option to sell the rights under the patents as distinct from the sale of any article, device or composition embodying the invention or capable of performing the invention does not constitute an "on sale" bar. *See Federal Sign & Signal Corp. v. Bangor Punta Operations, Inc.*, 357 F.Supp. 1222 (S.D.N.Y. 1973); *United States Electric Lighting Co. v. Consolidated Electric Lighting Co.*, 33 F. 869 (S.D.N.Y.1888).[11]

In any event, even if the sale of rights to the inventions to McBee under the facts of this case could be considered an "on sale" bar, the experimental use exception has been clearly established and provides an independent basis for concluding that Moore has failed to carry its burden of proving invalidity. *City of Elizabeth v. Pavement Co.*, 97 U.S. 126, 7 Otto 126, 24 L.Ed. 1000 (1877).

This Court, therefore, concludes that the Davis patents are not invalid under 35 U.S.C. § 102(b).[12]

C. *The Fraud And Inequitable Conduct Defense*

 As noted before, Moore contends that the Davis patents are unenforceable

---

11. Moore relies primarily upon *Kock v. Quaker Oats Co.*, 681 F.2d 649 (9th Cir.1982), *cert. denied*, 459 U.S. 1147, 103 S.Ct. 787, 74 L.Ed.2d 994 (1983). The Court finds this case inapposite because in *Quaker Oats* there was an actual sale of device, a prototype embodying the invention, expressly developed and built for the purchaser pursuant to a prior contract (681 F.2d at 651–

52). Furthermore, the Court did not address the threshold issue here, namely whether the sale of patent rights qualified as a 102(b) bar.

12. In view of the Court's finding there was no "on sale" bar, the effective filing dates of the patents need not be determined.

because of Davis' inequitable conduct in their procurement. This identical contention was elaborately briefed by Moore before the PTO in the reissue proceedings (TX 300 at 1047–70). The PTO, nevertheless, ruled that there "is an absence of evidence sufficient to clearly and convincingly support the conclusion that Davis, prosecuting his applications *pro se*, acted other than in good faith or that he was grossly negligent in not recognizing the materiality of the facts. (TX 300 at 1087; TX 301 at 993; *see also* TX 301 at 350–51, 431–32, 678–81, 717, 719–20, 914–16, 928–29, 982–84.) The Court agrees.

The law applicable on this issue was recently stated by the United States Court of Appeals for the Federal Circuit in *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1151 (Fed.Cir.1983), as follows:

> Fraud must be proved by clear and convincing evidence, and the party asserting it carries a heavy burden [cases omitted]. The intent element of the fraud, however, may be proven by showing of acts the natural consequences of which are presumably intended by the actor. Statements made with gross negligence as to their truth may establish such intent [case omitted]. The duty of candor owed the PTO being uncompromising, it would deal a death-blow to that duty if direct proof of wrongful intent were required. At the same time, that something thought to be true when stated, or a piece of prior art thought unimportant to the PTO's decision, was later determined to have been untrue or important, will not automatically and alone establish that fraud or inequitable conduct occurred. The fact finder must evaluate all the facts and circumstances in each case.

The Court turns now to the alleged inequitable conduct of Davis.

### 1. *Beilstein And Hinsberg*

Moore first contends that Davis' description of the Beilstein and Hinsberg teachings was intentionally incomplete. This argument is based on the overstated assertion that the Beilstein/Hinsberg teachings were particularly important to Davis because they "prompted him to make his invention in the first place" (D.I. 188 at 47), and they taught Davis that BSMH had the all important color forming properties needed for a color precursor (*id.* at 49). Moore says that this confirms Davis' knowledge of the criticality of these teachings, and confirms fraud (*id.* at 47–49, 51). The factual record, however, does not support Moore's assertion.

The research underlying Davis' inventions has been set forth in detail in the fact findings stated above. Beilstein did *not* teach Davis that BSMH or any other sulfinate of Michler's Hydrol had properties that made it useful as a color precursor in carbonless copy systems. First, neither Beilstein nor Hinsberg contain such teachings. Second, Davis himself conceived of the sulfinates as precursors before he consulted Beilstein. Beilstein is merely an index, and one must have a preconceived idea of a compound and its use before resorting to Beilstein. Davis' laboratory notebook confirms that he first gave "considerable thought" to "dye types which might give color under certain circumstances" and then he made "an examination of the literature to determine if ... $R_3C$–$SO_2$–$CH_3$ [a sulfinate] had been made" (TX 1141B at 16). Davis found BSMH in Beilstein following his conception; then he made it pursuant to his procedure (*not* Beilstein's); and then he tested it extensively in accord with his ideas, all as recorded in his notebook on April 5, 1955 (TX 1141B at 16–21). Third, Moore advanced this same argument to the PTO during reissue (e.g., TX 301 at 854–55), Scott refuted it (e.g., TX 301 at 915–16), and the PTO rejected it. Fourth, Davis knew only of the Beilstein abstract. He did not consult the original Hinsberg articles. Because he had his own method for making BSMH, he believed there was no need to go to the original articles (TX 301 at 484–85; Tr. 93–95, 262–63, 1800–01).

Moore's argument that Davis was "prompted" by Beilstein to make his invention is not supported by the evidence.

Moore's assertion that Beilstein's reference to appearance of color was of particular significance to Davis also was not proven.

Davis was the first to conceive and establish that the defined dyesalts had the properties required for use as a color precursor in carbonless copy systems. Davis never claimed an invention in simply a change of color. He has always described his invention in the context of and the properties needed for the carbonless paper systems in question.

All parties agree that Davis also "fervently believe[d]" that he had discovered a new chemical reaction (Tr. 1706). Davis recorded this belief in his laboratory notebook in 1955: "It became clear that these materials were not reacting with clay paper after [sic-in] an acid-base reaction (according to N.C.R.. Crystal Violet Lactone fashion) but were dissociating into the components under the intense electrostatic field at the clay surface!" (TX 1141B at 17–18.) Davis described his new reaction in the original 1955 dyesalt application (TX 1093 at 4–5). It was acknowledged in 1971 by Venkataraman (TX 1179 at 115), the "recognized authority" in the field of chemistry of synthetic dyes (TX 343 at 71).

One of the sulfinates which Davis found was suitable for use in carbonless copy systems, producing color by physical dissociation, was BSMH. Davis located BSMH *per se* in Beilstein in 1955, classified as a sulfone, with the routine and inconsequential observation that when certain acids were contacted with BSMH, a blue color appeared in the acid (Tr. 83–91, 1778–79). Such appearance of color with acids did not mean that BSMH had a colored and a colorless form, or that it could be changed back and forth between such forms, or that such a change (if it exists) would occur swiftly and dependably in a copy system environment. Neither Beilstein, which Davis read, nor the underlying Hinsberg articles, which Davis did not read, suggest in any way that BSMH had a colored and a colorless form, or that it produces color by physical dissociation in the high ionizing environment of clay, or that it has the myriad of properties

needed for Davis' invention. Davis discovered these facts, not Beilstein and not Hinsberg.

It was with this background that Davis included in his 1955 dyesalt application the single sentence on which all of Moore's fraud accusations depend. He acknowledged, "The only known member of this series (the sulfinate compounds he had discovered formed color by physical dissociation and had all the other required properties), that from Michler's Hydrol and benzenesulfinic acid ...." (TX 1093 at 6).

Davis in good faith advised the PTO of the essential teaching of Beilstein, as he viewed it, namely, that BSMH as a compound existed in the prior art. That was all that was of interest to Davis. He did not intend to mislead anyone, and the fact that the reissue Examiner rejected a few claims over Beilstein and Hinsberg based on a particular interpretation of their scope (TX 301 at 568–74), does not establish fraudulent intent or gross negligence on Davis' part. This is precisely what the PTO held when it rejected Moore's same fraud assertions.

Moore contends that Davis did not identify Beilstein by name in his dyesalt application, and suggests that Davis thereby intended to conceal Beilstein from those of ordinary skill in the art to whom all patent descriptions are addressed. (D.I. 188 at 50–51.) Moore's inference of intended deception is directly refuted by two important facts: (1) Davis acknowledged from the outset that BSMH was a "known" compound, and (2) Davis identified BSMH by the *exact* name used in Beilstein even though that name was technically "backwards" (Tr. 154). When Davis filed his 1955 application, Beilstein was the "organic chemist's bible" (Tr. 83; D.I. 145 at 19). Any organic chemist interested in looking up a known compound would have looked in Beilstein (Tr. 2014–15, 2118–19, 1787, 1655, 1658). The Examiner responsible for Davis' 1955 applications searched Beilstein. Moore's argument is unreasonable. Davis did not attempt to conceal prior art by first *admitting* that BSMH was known, and

then *identifying* it in the very way that facilitated, rather than hindered, finding it in the standard scientific literature.

Davis referred to BSMH in the same manner in which he was familiar from his limited prior patent experience. His only previous contact with patent applications had been at NCR (Tr. 149), where the standard for referring to prior art was, "it has been known hitherto" (Tr. 154), and that was the format that Davis used. This non-specific form of reference was used in an NCR patent which Moore introduced in evidence (TX 1143 at 13, lines 10–11). Davis believed that his method of referring to prior art was "how a scientist would identify it in a scientific way" (Tr. 153), and the record shows that it still is common among scientists today. Moore's expert, Dr. Rance, used a similar form of reference in his patent ("It is known ...", TX 1675, col. 1, line 32), and Moore's expert, Dr. Bailey, used that same non-specific mode of reference in his patents ("the use of ... has been known in the prior art," TX 1676, col. 1, lines 28–30; *see also* TX 1677, col. 1, line 33).

Nonetheless, Moore quotes from a 1957 letter to Davis from his Ohio patent counsel, suggesting that Davis give the full name of authors and books (D.I. 188 at 50). At the time of this letter, Davis was writing his 1957 applications in Colorado. He believed that his attorney was referring to any *new* references, beyond those in the original 1955 application which his attorney had already approved (Tr. 373). Davis did not think that the previously submitted 1955 application was in any way improper or that it should be changed.

Moore's charge of intentional "concealment" is further undermined by the fact that Hinsberg was specifically identified as the first entry on a list of prior art submitted to the PTO in connection with both of Davis' 1957 applications (TX 300 at 63; TX 301 at 65). One does not conceal a reference by placing it at the top of a list of references submitted to the PTO.

### 2. *Davis' Description Of Insolubility Of BSMH*

Moore has advanced a great deal of argument that Davis committed fraud on the PTO which he described in his dyesalt application (TX 301 at 484–56), that BSMH was "completely insoluble at room temperature in the usual solvents used in recording systems." Moore contends that Davis' previous work showed him that BSMH had sufficient solubility to produce pale blue color in contact with clay (Tr. 379–419).

The Court is satisfied that Davis was convinced at the time he made that statement and still believes today, that BSMH is a Davis dyesalt but its solubility is too low to make BSMH practical, that it inevitably comes out of solution over time and thus is completely insoluble in the context of recording systems. Even the pale blue color with the limited temporary solutions may be caused more by a refractive index phenomenon than by properly dissolved BSMH, and in any event the blue is too pale for a recording system. Moreover, the *solubility* of BSMH was *never an issue* in connection with the *patentability* of any claim in any of the various applications for the Davis patents.

The "usual solvents used in recording systems" in 1955 were Araclor and oleic acid for carbon paper, and various Araclor-kerosene and/or Araclor-paraffin oil mixtures for carbonless paper such as NCR's with the CVL/BLMB precursor systems (Tr. 407; D.I. 149 at 633–34). There is no significant difference between kerosene and paraffin oil in this context (Tr. 406). Araclor-kerosene and/or Araclor-paraffin oil mixtures, and oleic acid as well, are comparatively weak solvents, whereas benzene and toluene, which were not usually employed in recording systems, are comparatively strong solvents (TX 301 at 485–86, ¶ 9). In 1955, Davis tried working with both BSMH and PTSMH in the usual Araclor-paraffin oil and oleic acid solvents, and also in the more powerful solvents, before writing the BSMH insolubility observation in question (Tr. 384, 388–402, 404–06, 444–50; D.I. 149 at 626–39).

His solubility findings in the stronger solvents convinced him that BSMH was not permanently soluble. He believed that if it would not stay in solution in the stronger solvents, then it certainly would not in the weaker "usual" solvents used in recording systems in 1955 (Tr. 391). Davis explained that, if a powerful solvent such as toluene did not hold BSMH in solution long enough, then "weak solvents wouldn't have a chance" (Tr. 102; *see also* Tr. 108). The solubility of BSMH was "no good" for his recording system purposes (Tr. 105–06), and if he had not been able to make a more soluble material than BSMH, "I was done" (Tr. 106).

Davis' concerns about solubility problems with BSMH, particularly when compared with PTSMH, are supported by his earliest laboratory notebook records. On April 6, 1955, the second day of Davis' notebook entries relating to his dye salt invention, Davis recorded that BSMH "was *extremely* insoluble in toluene (eventually gave no color to the clay paper)" (TX 1041B at 22; emphasis in original; *see also* Tr. 126–27). He went on to note, by contrast, that PTSMH "showed unexpectedly high solubility" in various solvents, and further that PTSMH–Araclor 1248 (3%) solutions "are stable in light and do not crystallize out the unionized product" (TX 1141B at 22). The early recognition that BSMH would not stay dissolved, but would crystallize out, unlike PTSMH, indicated complete insolubility for practical usage in recording systems (Tr. 420) which, of course, is what Davis was interested in, and what his patents in general and the sentence in issue concern.

There is no question that BSMH will dissolve in *hot* benzene, an unusually strong solvent (Tr. 101, 379), but carbonless copy papers are used at room temperature, and the dye precursor must remain in solution, in relatively weak solvents, for long periods of time (2 to 5 years) at room temperature or even cold temperatures (Tr. 105, 412–13, 618, 638; D.I. 153 at 1054). Even though BSMH dissolved when heated, it eventually came out of solution after it cooled down (Tr. 101, 413, 449–50). After such "coming out of solution" has finally occurred, BSMH in toluene "gave no color to the clay paper," as Davis recorded in his 1955 lab notebook (TX 1141B at 22; Tr. 101–05, 407–08). Sooner or later, "it all comes out" (Tr. 449–50). That was especially true with the usual, less powerful solvents such as oleic acid (Tr. 384) and Araclor-paraffin oil mixtures (Tr. 407–08). The important consideration from Davis' recording system standpoint was the color forming properties of BSMH after a hot solution has cooled down, after "everything has come out" (Tr. 449).

Davis documented his 1955 conclusion that BSMH was insoluble several years later, when he wrote in his notebook in 1959: "A saturated soln. of [BSMH] was prepared (very *slightly* soluble) in acetone ...." (TX 1140B at 12; emphasis in original.) Thus the practical insolubility of BSMH was twice documented by Davis in his laboratory books, contrary to Moore's assertion of "no documents" (D.I. 188 at 56).

Even with the temporary solutions of BSMH in strong solvents, Davis was never certain whether the pale blue color on clay resulted from dissolved BSMH, or from a refractive index phenomenon (Tr. 410–11, 420; D.I. 149 at 631–40). In any event, the blue color was so pale that Davis could not identify it with any precision in different rooms with different lighting conditions (Tr. 402, 409–12, 449) and he believed it was hardly a useful color for a commercial recording system.

The Court is convinced that Davis had a good faith belief that BSMH is "completely" insoluble in the relevant context of recording systems where weak solvents, low temperatures, long times and intensely colored images were an inescapable fact of life and considering that solubility was never a patentability issue during prosecution—this is a complete answer to Moore's charges of fraud on this issue (e.g., *Kansas Jack, Inc. v. Kuhn,* 719 F.2d at 1151).

Additional evidence at trial further demonstrates that Moore's fraud arguments

and evidence are inconsistent, unclear, and far from convincing that Davis was grossly negligent or reckless.

The Hinsberg articles substantiate the insolubility of BSMH, stating that it is "readily soluble in hot benzene" but that it is recrystallized from benzene (e.g., TX 1615 at 2). "Recrystallization" indicates insolubility (Tr. 1204–05, 1243, 381–83). Moore's expert, Dr. Bailey, confirmed that a solvent used for recrystallization is one in which the product to be recovered (BSMH) is highly soluble when hot, but essentially insoluble when cooled (Tr. 1846–55).

Moore's own early work contradicts its trial presentation that BSMH has useful solubility. An internal Moore technical report in 1975 states that BSMH is not soluble when stirred at room temperature; not soluble when stirred at 60° C; and that even after dissolution by stirring at 100° C (212° F), it does not form a stable solution when cooled to room temperature (TX 427 at 5). The solvent used was DBP (Tr. 605), a newer solvent which became available for use in recording systems about the time the original Davis patents issued (TX 427 at 4).

Moore relies heavily on tests presented by Moore's expert, Dr. Bailey, but he did not perform those tests. They were conducted by his chemistry students, who were not present in court (Tr. 1736–38). Dr. Bailey's students ran three sets of BSMH solubility experiments (TX 1655; Tr. 1740–45). One set of data was inconsistent with the other two, and Dr. Bailey threw it out (Tr. 1743–45, 396). Additional doubt as to the accuracy of the data arises from the fact that Dr. Bailey's students concluded BSMH is about three time more soluble in benzene than PTSMH is (Tr. 1648–50; TX 1650). Moore's in-house people in 1975, and Davis back in 1955, came to just the opposite conclusion that PTSMH is "more than" or "at least" three times as soluble as BSMH (D.I. 149 at 643; Tr. 391–92, 396–400).

The trial presentation by Moore's in-house chemist, Nancy Mitchell, shows that by using more extreme conditions for dissolving (extensive stirring) the BSMH would come out more slowly (TX 1711 at 16; Tr. 419). The fact that Mrs. Mitchell's BSMH came out of solution more slowly does not contradict Davis'· understanding that "It all comes out eventually" (Tr. 449–50). Davis stirred for a few minutes seeking a practical precursor for commercial use (Tr. 407, 416; D.I. 149 at 613–17); he was not conducting laboratory exercise to force BSMH into solution at all costs.

No one has ever used BSMH commercially in carbonless paper. One compelling reason is that copy paper forms frequently are stored for long times in cold warehouses before use, whereupon the BSMH would come out of solution and the forms would be useless (Tr. 413–14, 1187). There is no doubt that PTSMH is superior to BSMH in regard to solubility. Moore's internal documents recognized that PTSMH "is superior" (TX 108), and "there is no substitute for PTSMH" (TX 111, ¶¶ 1–4).

In an unusual byplay between Davis, the witness, the Court and Mr. Remus, Moore's counsel, Mr. Remus was asked why Moore did not use BSMH commercially but he evaded any admission against interest about insolubility. Instead, he said, "It's covered by the patent. If we used the benzene sulfinate of Michler's Hydrol, it would still infringe the patent" (Tr. 426; see also Tr. 413–14, 416).

That answer tends to disprove Moore's argument that Davis had a motive to "knowingly misdescribe his own work" (D.I. 188 at 56) in order to get around BSMH to get broad patent protection. BSMH is a Davis dyesalt, and to the extent that BSMH might be used in a recording system, perhaps with newly developed solvents, the broader patent claims cover such use, just as Mr. Remus admitted during trial. For example, claims 2 and 4 of the 327/803 reissue patent (TX 1091) recite transfer or manifolding sheets having a coating containing such a material. Davis did not get his patents by "excluding" BSMH. He advised the PTO that it had the necessary color forming properties to be useful. He claimed its use in recording

systems. He never claimed the BSMH compound alone as an invention, of course, because the compound *per se* was already known to science. He had no motive to give false information about the insolubility of BSMH, because he did not have to "get around" anything.

Moore's attempt to legitimize its infringement through an attack on Davis regarding the insolubility of BSMH must fail. Davis stated in his patent application what he had observed. The solubility of any Davis dyesalt was never a patentability issue. Moreover, Moore made these same arguments during reissue, complete with demonstrative exhibits having blue discolorations (Tr. 1865–71; TX 300 at 636–39, 647–54, 785–90, 948–51; TX 1657–64). The PTO properly rejected those arguments and exhibits because they did not adversely reflect on patentability or enforceability of the Davis patents and this Court agrees.[13]

The Court, therefore, concludes that the creditable evidence demonstrates that Davis acted in good faith in prosecuting his patents before the PTO and Moore has not carried its burden of showing by clear evidence that Davis acted in bad faith or gross negligence. The Davis patents are not unenforceable for fraud or inequitable conduct.

## IV. DATE OF TERMINATION OF LICENSE AGREEMENT AND INFRINGEMENT

Based upon the findings of fact set forth above, the Court is convinced that when Moore carried out Downies' threat on June 1, 1976 (TX 232), and refused to make royalty payments for the third calendar quarter of 1976, which fell due at the end of October 1976, Moore effectively terminated the Scott-Moore license agreement.

The termination provisions of the Scott-Moore license agreement were amended in 1975 to provide:

> If either party hereto shall fail or refuse to comply with any obligation hereunder, and if such default shall continue unremedied for sixty (60) days after written notice is given to the defaulting party by the other party of the existence of such default, then at any time after the expiration of the said sixty (60) days, the other party may elect to terminate this agreement.

(TX 310.)

Moore's termination was in compliance with these amended termination provisions, and it was premised on an asserted unremediable default by Scott, namely, Hinsberg made the licensed Davis patents invalid and unenforceable. This is clear from Downie's written notice of June 1, 1976, which specifically referenced the 1975 amendment and then advised Scott that the licensed Davis patents are "invalid" because they are "anticipated" by Hinsberg. Leaving no question that Moore considered this to be an unremediable default, Downie further explained in his notice that the "failure to disclose" Hinsberg to the PTO raises a "serious question about the procurement of the patents and the licensing of Moore" (TX 232).

During the sixty-day notice period required by the termination provisions, Moore made a final royalty payment on July 26, 1976 (Tr. 1461–63; TX 79). Moore did not make the next payment when it was due by the end of October of 1976, or any other payment thereafter, thus effectuating Moore's election to "terminate this agreement" (TX 310).

Downie confirmed at trial that the invalidity of the licensed Davis patents was "a basic defect or default in the license," he was not "going to pay any more royalties," he was "giving them notice of that," and "That was it," and he "never changed that opinion" (Tr. 1414–15). Mr. Richter of Scott, who negotiated the agreement with

---

**13.** Moore has made some additional allegations in an attempt to show that Davis made intentionally false statements to the PTO (D.I. 188 at 60–62). The Court has considered these accusations and finds that they are picayune, if not outright frivolous, and there is no need to extend this opinion with a detailed discussion of those charges.

Moore, interpreted Moore's action as a termination (Tr. 966).[14]

Nevertheless, after the termination and Moore's refusal to pay royalties, Moore continued to use PTSMH in its MCP business forms for the remaining life of the Davis patents (Tr. 1532, 1351; D.I. 113 at 7; TX 343 at 3–5, 10–11, 23–26, 31–32, 38, 42–44, 61–64).

Scott charged Moore with infringing claims 1, 2, 3, 4, 9, 10, 11 and 14 of the 327/803 reissue patent (TX 1091) and claims 1, 2, 3, 5, and 10 of the 404/797 reissue patent (TX 1090; D.I. 113 at 8–9). These are all original claims, i.e., claims of reissues which are identical to claims in the original patents, so Scott is entitled to damages from the date Moore stopped paying royalties to the date the reissue patents expired, 35 U.S.C. § 252. Claim 17 of the 404/797 reissue is also at issue, but there is no corresponding claim in the original 404 patent.

The structure and composition of Moore's accused MCP paper, and the processes necessarily practiced when it is used, have been stipulated (D.I. 113 at 7–8).

All involved claims of the 327/803 patent are directed to transfer or manifolding sheets, and MCP business forms are made from such sheets, so Moore's sale of these business forms is a direct infringement under 35 U.S.C. § 271(a). All involved claims of the 404/797 patent are directed to methods of printing. The only known use of MCP business forms is to practice these methods (D.I. 113 at 8, ¶ 13). Consequently, Moore's advertisement, promotion and sale of such business forms constitute active inducement to infringe, as well as contributory infringement, under 35 U.S.C. § 271(b) & (c).

Moore's non-infringement defenses as to both Davis patents were limited to two contentions: (1) its MCP products do not "perform" as do the Davis inventions; and (2) PTSMH is "not a salt" (D.I. 113 at 8–9, 22). Neither contention is tenable. Both are refuted by the admissions of infringement by Moore's scientists and counsel before trial.

Regarding Moore's contention about "performance," if, as here, the accused matter falls clearly within the terms of the claims, then infringement is made out. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950); *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753 (Fed.Cir.1984); *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1579 n. 2 (Fed.Cir. 1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983); *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 770 (Fed.Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984).

As to Moore's argument that PTSMH is an ester, rather than a salt, the testimony of the creditable witnesses and documents from Moore's own files establish by a preponderance of the evidence that PTSMH is a salt.

Davis firmly believed that PTSMH was a salt, for many reasons (Tr. 266–72). He was cross-examined at length on the "salt" issue, but that merely reinforced the conviction, which he has held since 1955, that the sulfinates of Michler's Hydrol are salts (Tr. 99, 268–70, 501–10). An inventor is his own lexicographer, and the patent claims must be construed in connection with the rest of the patent and with the circumstances surrounding the inception of the patent application, *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1570–71 (Fed.Cir.1983) (and cases cited therein).

Moore's most knowledgeable employee—witness Dr. Macaulay (Tr. 649–52)—explained at trial that the term "salt" in the Davis patents did not give him any trouble at all in understanding the Davis patent in the first instance, nor did it hinder him from making and using PTSMH on either an experimental or commercial basis (Tr. 653–87). The only evidence presented by Moore to show PTSMH was an ester rather than a salt was the highly questionable

---

**14.** Moore argued that the license agreement was not terminated until October 9, 1979 (D.I. 188 at 72–73). The Court, however, finds this contention unpersuasive.

Nuclear Magnetic Resonance (NMR) spectra prepared by Dr. Bailey's students.

■■■ The Court finds · that Moore infringed the Davis patents from the date it terminated the license agreement in October 1976, until the patents expired in mid-1982.

## V. DAMAGES

### A. *Actual Damages*

Damages in a patent infringement case must be "adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made by the invention by the infringer." 35 U.S.C. § 284. In the present case, it is appropriate to base the actual damages on the royalty rate established in the Scott-Moore license agreement. This is so because it represents the negotiated and agreed upon rate at the time the parties were a willing licensor and licensee. Scott and Moore have stipulated that the actual damages calculated over the infringement period October, 1976 to mid-1982 at the royalty rate is $7,470,607. (D.I. 113, ¶ 17.) [15]

### B. *Pre-Judgment Interest*

■■■ Prejudgment interest on actual damages should ordinarily be taxed under 35 U.S.C. § 284 as part of the patentee's damage award to compensate for the infringement absent some justification for withholding such an award. *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 103 S.Ct. 2058, 2063, 76 L.Ed.2d 211 (1983); *Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d 734, 743 (Fed.Cir.1984). The next question for determination is the method and basis for the prejudgment interest calculation. After considering the evidence on this issue (Tr. 1273–88, 2136–45, 1873–1909), the Court concludes that the fairest

method would be to apply the average annual prime rate (TX 1635) to the stipulated amounts of royalty payments withheld by Moore (D.I. 113, ¶ 17; TX 1636), compounded on a variable interest basis for the periods involved (TX 1638) which produces prejudgment interest through the end of 1983 in the amount of $5,050,985 (*id.*) [16] Awarding prejudgment interest in this manner will compensate the patent owner for the lost use of money representing royalties due which were not paid when due. *See Leinoff v. Louis Milona & Sons, Inc., supra*, 726 F.2d at 743; *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1066 (Fed. Cir.1983); *Railroad Dynamics, Inc. v. A. Stucki Co.*, 220 U.S.P.Q. 929, 934, 942 (Fed. Cir.1984).

Moore advances two arguments in justification of a lesser award of prejudgment interest. First, Moore argues that prejudgment interest should run only from 1981 when the Davis patents were reissued because Scott "unduly delayed" prosecution of this action by a four year "frolic and detour" to the PTO for the reissue proceedings. (D.I. 188 at 76–78). Second, Moore advocates a fictional interest rate called "Scott's borrowing mix" (D.I. 188 at 78–80). Having fully considered the parties' contentions and evidence, the Court finds neither of Moore's justifications persuasive. The reissue proceedings were not sought for the purpose of delay. Both parties at the time, in which Moore was an active protestor, believed those proceedings would be beneficial to each. As to an interest rate based on Scott's so-called "borrowing mix," the theory was based on incorrect suppositions (Tr. 2137–40).

### C. *Wilful Infringement*

■■■ Scott requests the Court to find that Moore's infringement of the Davis pat-

---

**15.** Intervenor Davis did not stipulate to the amount of actual damages (*id.*) because he believed the royalty payments agreed upon were too low (Tr. 272–82). After considering all the evidence on this issue (Tr. 1878–81), the Court finds and concludes that Davis did not meet his burden of proving by a preponderance of the evidence that the stipulated actual damages were incorrect. The Court therefore accepts the

$7,470,670 figure as the actual damages for Moore's infringement of the Davis patents.

**16.** Of course, the prejudgment interest finally awarded to the date of judgment will have to be calculated on the same basis for the period from January 1984 to the date judgment is entered.

ents was wilful. If the fact finder finds as a fact that the infringement was wilful based on "the totality of the circumstances presented," "the Court may increase the damages up to three times the amount found or assessed" 35 U.S.C. § 284. Any enhancement of actual damages is within the trial court's discretion based on the proven facts before it. *Rosemount, Inc. v. Beckmann Instruments, Inc.*, 221 U.S. P.Q. 1, 8 (Fed.Cir.1984). Wilfulness is established where it is shown there is a deliberate purpose to infringe, *Wilden Pump & Engineering Co. v. Pressed & Welded Products Co.*, 655 F.2d 984, 989 (9th Cir. 1981), or the infringer acted with "reckless disregard" for patent rights of which it had knowledge, *Milgo Electronic Corp. v. United Business Communications*, 623 F.2d 645, 666 (10th Cir.), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980), or where the infringer had "no reasonable basis" for believing it had a right to do the acts in question. *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1565 (Fed.Cir. 1983).

Based on the facts found above, the Court is convinced that Moore intentionally and wilfully terminated the license agreement in October 1976, and thereafter continued to infringe the Davis patents until those patents expired in mid-1982. The evidence is overwhelming that Downie terminated the license and continued to use PTSMH purely for "business reasons" to cut the "costs" of making Moore's MCP. The Court further concludes that the citation of Hinsberg in 1976 was a makeweight reason for disregarding Scott's patent rights.

There are two recognized defenses to wilful infringement, the existence of so-called "good faith" defenses, and an "honest doubt" about validity or infringement due to the good faith reliance on the advice of counsel.

 A party, however, does not avoid wilful infringement merely by asserting that it acted on the advice of counsel. A potential infringer, with actual notice of the pertinent patents, has "an affirmative duty to exercise due care to determine whether or not he is infringing" and must "seek and obtain competent legal advice from counsel." *Underwater Devices, Inc. v. Morrison-Knudsen Co., Inc.*, 717 F.2d 1380, 1389–90 (Fed.Cir.1983).

 "Obtaining a conclusory opinion of counsel letter after the manufacture of the infringing device and after a notice of infringement ... does not indicate good faith. The opinion ... is simply too little too late", *Dickey-John Corp. v. International Tapetronics Corp.*, 710 F.2d 329, 348 (7th Cir.1983). An infringer must obtain and rely on a timely opinion of counsel, *Lam, Inc. v. Johns-Manville Corp.*, 668 F.2d 462 at 475 (10th Cir.1982), and the infringer must supply all pertinent facts to counsel as a basis for a reliable opinion, *Brian Jackson Associates, Inc. v. San Manuel Copper Corp.*, 305 F.Supp. 66, 72 (D.Ariz.1969).

Moore argues that Downie relied upon opinions it received from two outside law firms to the effect that "the Hinsberg articles rendered the Davis patents invalid" (D.I. 188 at 82; Tr. 1352–53), but these opinions were never offered or placed in evidence (D.I. 188 at 83). Furthermore, there is nothing in the record to even suggest that the outside firms were supplied with all relevant facts, particularly the facts concerning Moore's unsuccessful efforts to find a suitable precursor until it learned the way through the Davis patents. Moore contends that it did not have the burden of introducing the legal opinions into evidence (*id.*) This is incorrect. Scott's original complaint in 1977 averred that Moore's infringement after it terminated the Scott-Moore license agreement in 1976 was "willful" and demanded "treble damages" (D.I. 1). For years Moore, if it had the opinions, had the "affirmative duty," and the motive to demonstrate "good faith" so that Moore very clearly had the burden to come forth with such evidence. Moore cannot rely now on alleged opinions not in evidence to negate its bad faith.

Moore's Downie made it very clear on cross-examination that the opinions of counsel were nothing more than window dressing to his decision to terminate the agreement. The real reason for terminating the license was that its "cost" was getting higher than Downie liked because Moore could not develop a precursor to replace PTSMH according to the timetable which he had dictated. Downie stopped paying royalties for pure and simple "business" and "commercial" reasons. These reasons did not change even after the PTO reissued the Davis patents over Hinsberg, upon which the opinions allegedly were based.

There is no creditable evidence that Moore sought or received a written opinion after the Davis patents were reissued despite Hinsberg and all the other defenses reasserted by Moore at trial. If such an opinion was received, it was not introduced into evidence. The fact is that Downie simply disregarded the PTO's decision to reissue the Davis patents as once wrong, always wrong (TX 1639 at 129).

Moore further suggests that Scott had second thoughts as to the validity of the Davis patents. It is true that Scott and Davis did propose a royalty reduction "after Hinsberg had arrived on the scene" (TX 1080 at 3–4), but the timing of this suggestion was not an acknowledgement that Hinsberg diminished the value of the Davis patents. To the contrary, Scott considered Hinsberg to be nothing more than "Downie's latest ploy to get a royalty reduction" (TX 1079), and Scott "did not agree with Moore's contention" (TX 1080). Downie made it clear that what he really sought was a royalty reduction, and Scott offered to do so simply as a "compromise" to avoid the time and expense of discovery and trial (TX 1081, 1083, 1084; Tr. 948, 957–63, 1394, 1402, 1461). Moore rejected the proposed compromise, and it is disingenuous for Moore now to suggest that it be permitted to take advantage of that offer.

Also to negate bad faith, Moore complains that it did not have a "full and fair opportunity" to contest the validity of the Davis patents during the protested reissue proceedings, citing the decision of this Court in *Rohm & Haas Co. v. Mobil Oil Corp.*, 525 F.Supp. 1298, 1305 (D.Del.1981) (D.I. 188 at 85). Nothing could be further from the truth. In the present case, each reissue application file exceeds 1,000 pages (TX 300, 301), in large measure because Moore took full advantage of its opportunity to contest validity on every conceivable ground. Moore also had a full and fair opportunity to conduct discovery during the reissue proceedings, such as taking the deposition of Davis, which the PTO would have considered (Tr. 1157–58). Moore cannot now use its tactical decision to take no discovery in this action during the reissue proceedings as a basis to argue that it did not have a full opportunity to present all relevant evidence.

In the light of all the proven facts and circumstances of this case, the Court concludes that Moore wilfully infringed the Davis patents from October 1976 until they expired in 1982 and that the actual damages with prejudgment interest heretofore discussed should be doubled as provided in 35 U.S.C. § 284. Doubling the damages is not unreasonable in this case particularly since Moore's net sales value of the MCP recording paper during the infringing period amounted to almost three quarters of a billion dollars (D.I. 113, ¶ 16).

## VI. ATTORNEY FEES—EXCEPTIONAL CASE

Both Scott, the plaintiff, and Davis, the intervenor, seek an award of attorney fees against Moore. Moore concedes that Scott, as the owner of the Davis patents has a right to request fees but asserts that Davis does not have standing to seek attorney fees from Moore (D.I. 188 at 86 n. 1).

Under 35 U.S.C. § 285, a district court may award attorney fees to the prevailing party in "exceptional" cases. The decision to award or deny fees is discretionary. *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 962 (Fed.Cir.1983); *Orthopedic*

*Equipment Co. v. All Orthopedic Appliances,* 707 F.2d 1376, 1384 (Fed.Cir.1983).

The Court finds this case to be exceptional not only because of the intentional and deliberate infringement but also because of Moore's persistent exceptional behavior during the course of this prolonged litigation. A series of events occurred which went far beyond reasonable advocacy and when accumulated amount to unconscionable behavior.

After it became apparent during the reissue proceedings that claims of the Davis patents covering MCP were valid despite Moore's protest based on Hinsberg, and before full discovery by Scott, Moore destroyed a huge volume of relevant documents in 1980 (D.I. 156). Eight hundred of the destroyed documents were claimed to be privileged, but their destruction prevented Scott from testing the privilege claims. Moore has always maintained that their destruction was accidental and the Court, of course, makes no finding in that respect. It was at least a reckless mismanagement of evidence.

But it did not end here. Moore's counsel on October 14, 1982, assured the Court that the destroyed documents would have shown that Moore scientists knew about the PTSMH "magic key" before they knew about the Davis patents (TX 312):

> In addition, certain of the documents produced, but possibly destroyed, would corroborate that Moore's knowledge of the PTSMH colorless precursor in issue was known to Moore's scientists before they had knowledge of the Davis patents and that, therefore, the Scott/Davis theory that the teachings of the Davis patents somehow provided a magic key to Moore's commercialization of carbonless copying paper is without merit. In short, Moore has lost more in the way of evidence than either Scott or Davis.

(TX 312.) Facts later revealed that Moore's assertions were not correct.

Deposition discovery began in early 1983, and Moore's Dr. Macaulay, Dr. Baxter and Mr. Maalouf readily recalled that Dr. Henn Ruus was the first Moore scientist to try PTSMH as a color precursor. Dr. Ruus had long since left Moore's employ and moved away, and Macaulay, Baxter, Downie, and Maalouf uniformly maintained during their depositions that they could not recall whether Dr. Ruus learned of PTSMH independently of the Davis patents, or whether he first had a Davis patent which taught him about PTSMH (Tr. 692; TX 341 at 174–76; TX 1639 at 54–55; TX 342 at 91–97).

Scott advised Moore that Scott wanted to depose Dr. Ruus, because he was the only non-Moore person from whom the true story might be discovered. Moore represented that it did not know where Dr. Ruus was located, since he had left the upstate New York area many years ago without leaving a forwarding address. Conversations between counsel concerning this took place in the presence of Dr. Macaulay (Tr. 707–707a), and Moore's expert, Dr. Bailey (Tr. 1718–20). Scott had learned that Dr. Ruus was still a member of the American Chemical Society ("ACS"), but the ACS would not voluntarily provide his present address, so a subpoena had been prepared and forwarded to Washington, D.C., to compel the ACS to produce the present address of Dr. Ruus. When Dr. Bailey learned of the subpoena, he (a member of the Board of Directors of ACS) volunteered to telephone the ACS office and get Dr. Ruus' address. Scott asked him to do so and Moore's counsel of course did not object under those circumstances, and that is how Scott and Davis finally learned the whereabouts of Dr. Ruus (Tr. 1719–22).

Later discovered Moore records, however, revealed that both house counsel and outside counsel for Moore, and Downie as well, had known the California address of Dr. Ruus all along. It had not changed in many years (Tr. 1369–71, 707–11; TX 325, 326, 329, 1612).

When Dr. Ruus' deposition was finally taken, he testified that before he left Moore in 1972 he made an entry in his laboratory notebook, and he told Dr. Macaulay or Dr. Baxter and Mr. Maalouf, that he learned about PTSMH directly from the

Davis patent. Apparently, Moore's employees knew the source of PTSMH and its destroyed documents could not have shown, as Moore assured the Court, that it was the other way around (Tr. 705; TX 340 at 53).

Moore admits (D.I. 188 at 88–89) that its numerous representatives who knew the California address of Dr. Ruus all along (including its general counsel, Mr. Kohn, who was involved in this suit since 1977 [TX 328; *compare* D.I. 188 at 88]) "might" have been able to locate him "more quickly" than the way Scott/Davis found him through Dr. Bailey, yet Moore insists, despite this admission, that its counsel was not trying to hide Dr. Ruus. The widespread knowledge of Dr. Ruus' address within Moore appears to contradict this contention. It also ignores the fact that each Moore representative who had worked with Dr. Ruus and had been told by him how he learned of PTSMH was specifically asked on deposition about this, but claimed lack of recall. Throughout these months of discovery by Scott on this sensitive issue, with the cut-off date for completion of discovery fast approaching, Moore's counsel repeatedly informed Scott that Dr. Ruus could not be located (Tr. 691–92; TX 1639 at 54–55; TX 341 at 176–76; TX 342 at 91–97). At a minimum, withholding Dr. Ruus' address was due to a lack of good faith investigation in violation of Rule 11 of the Federal Rules of Civil Procedure.

The second instance of exceptional behavior occurred during the reissue proceedings before the PTO. After Examiner Hoffman allowed the claims in issue, over Moore's protest based on Hinsberg, the application files left the Examiner's jurisdiction and were sent to the Assistant Commissioner of Patents to review Moore's fraud allegations (Tr. 1082; TX 301 at 566).

When Examiner Hoffman no longer had custody of the files, Moore filed a paper with the Assistant Commissioner in October of 1979 in which its counsel asserted that Examiner Hoffman, in a telephone conversation in February of 1978 with Edward W. Remus, counsel for Moore, said that Hoffman "had to give Scott something or else Scott had nothing before the Judge" (Tr. 1085–86; TX 300 at 749; TX 301 at 649).

When the application files were later returned to Examiner Hoffman, he saw Moore's representation, and in an official paper signed November 3, 1980, he responded that he "emphatically denies that he ever made (or even thought) the statement attributed to him" by Mr. Remus. "He has never believed that he 'had to give' anything" to Scott or to anyone else. He noted that Moore's protest was not filed until March of 1978, so Mr. Remus' name did not even appear in the record at the time of the alleged phone call in February of 1978, and this makes it "clear that the alleged telephone conversation is a product of Mr. Remus' imagination, or perhaps, a result of wishful thinking combined with faulty memory" (Tr. 1096; TX 300 at 1030; TX 301 at 936).

After the Examiner sent the files back to the Assistant Commissioner's Office, counsel for Moore filed another paper in January of 1981 contending that the alleged telephone conversation had taken place in February of 1979, not "1978" as originally asserted. Counsel for Moore otherwise stood by the assertion that Examiner Hoffman had told Mr. Remus he had to give Scott something before the Judge (Tr. 1101–02; TX 300 at 1042–43; TX 301 at 950–51).

After the reissue patents were granted, Scott obtained certified copies of the PTO files of the reissue applications for use as exhibits at trial, and it was then learned that Examiner Hoffman had expressed his feelings even more bluntly about the way he was misquoted by Moore's counsel. On the page in each file where the misquote by Moore's counsel first appeared, Examiner Hoffman wrote in the margin (Tr. 1086–87; TX 300 at 749; TX 301 at 649):

"THIS IS A LIE! NO SUCH STATEMENT WAS EVER MADE BY ME IN ANY CONVERSATION WITH ANYONE!

(signed) James R. Hoffman"

Then, on the page in each file where Moore's counsel "corrected" the date of the call but stood by the misquote, Hoffman wrote (Tr. 1101–02; TX 300 at 1043; TX 301 at 951):

> "Examiner Hoffman categorically denies that he made the statements attributed to him by Mr. Remus in 1979 or at any other time. Mr. Remus is clearly ~~a pathological LIAR!~~ mistaken!
>
> (signed) James R. Hoffman
> 5/7/81"

At trial, the witness Witherspoon confirmed that these notations were in the handwriting of and signed by Examiner Hoffman (Tr. 1085–86, 1102). Examiner Hoffman made certain, by his handwritten denials in the official record, that Moore would not misquote him further. Mr. Remus was present at the trial, but he did not take the stand and testify, or otherwise address the point.

Moore, in its brief, downplays counsel's misquote of Examiner Hoffman as "not relevant" to any issue in this case (D.I. 188 at 89). To the contrary, the exposed misquote evidences Moore's casual regard for forthrightness.

A third instance of exceptional behavior of Moore is the withholding of documents which should have been produced on discovery.

Davis was the first witness to testify at the trial. Shortly after commencing his lengthy cross-examination, Mr. Remus confronted Davis with a handwritten document which he assured Davis, "you have not seen before today, at least in this litigation" (Tr. 289). The document is undated, and Mr. Remus had obtained it from the files of Hilton-Davis Company. Moore's contention was that Davis had disclosed one of his patented dye salts, the diethylbenzene sulfinate of Michler's Hydrol, to Hilton-Davis in August of 1957 (Tr. 288–92; TX 1625, 1631).

Mr. Remus obtained the document from Sterling Drug, the parent company of Hilton-Davis. He acquired the document on January 3, 1980, more than four years be-

fore trial (TX 1634). The document is plainly responsive to Scott's discovery requests (e.g., D.I. 8, Int. 16, 17), but Moore never produced it during discovery.

Hilton-Davis sent three documents to Mr. Remus at the same time in 1980, and the handwritten document was designated EXHIBIT III. EXHIBITS I and II were letters between Davis and Hilton-Davis which Davis had already located in his records, and submitted to the PTO with the reissue applications in late 1977 (TX 1634; TX 300 at 251–53; TX 301 at 253–55).

The PTO specifically sought further information about "the purpose" of Davis' contact with Hilton-Davis in 1957 (TX 300 at 801 ¶ 5, 808 ¶ 7; TX 301 at 702, 709). The PTO sought this information in May of 1980, after Mr. Remus had received the two letters and the handwritten sheet from Hilton-Davis. Davis duly responded in a Declaration signed June 9, 1980 (TX 300 at 845 ¶ 10; TX 301 at 746), but he obviously did not have the handwritten document.

Moore criticized Davis' response in July of 1980, asserting that it is a "flagrant breach" of the "duty of good faith and candor" to withhold documents "evidencing Davis' intent with respect to his pre-critical date 'on sale' activities" (TX 300 at 956, 958, 992; TX 301 at 860, 862, 898). Moore had earlier acknowledged that it had the same duty (TX 300 at 622). While Moore was proclaiming Davis' duty not to withhold, Mr. Remus knew the PTO and Davis did not know about the handwritten sheet; yet, Mr. Remus had it, and he knew the PTO was interested in it, yet he withheld it.

Moore claims that the document was kept secret in order "to impeach Mr. Davis at trial." This, however, is a weak excuse in the circumstances of this case. Moore's counsel withheld the document for four years when he knew it was responsive to the PTO's request for information and to Scott's discovery requests. Furthermore, even if the document was material to Moore's defense, it has no adverse effect on validity, because such a disclosure to a possible supplier to assist development efforts is not a public use or offer to sell of

the type which would defeat a patent. Thus, Moore's contention is irrelevant because the diethylbenzene sulfinate of Michler's Hydrol identified in the document is fully disclosed in Davis' 1957 transfer sheet application, which had been filed three months earlier on May 10, 1957 (Tr. 1062; TX 1095 at 10).

Finally, exceptional behavior occurred during the trial when Moore in support of its non-infringement defense introduced certain NMR (Nuclear Magnetic Resonance) spectra to show that PTSMH was an "ester" rather than a salt as described in the Davis patents. Suffice it to say that the Court finds Moore's spectra to be flawed as was proven by the testimony and evidence presented by Dr. John Mattor (Tr. 2146–67). This sideshow of "ester or salt" extended the case and created a definite impression that the Moore tests were badly flawed by the solvent used in those tests.

 Hence the Court concludes that based on all the circumstances of this case, it must be considered exceptional when considering attorney fees.

Having found the case exceptional, reasonable attorney fees will be allowed to Scott, the owner of the Davis patents, for the prosecution of this action. This, however, does not conclude the matter because Davis, the intervenor, has also requested that he be awarded fees for his attorney from Moore pursuant to 35 U.S.C. § 285. This the Court may not do.

The recovery to be ordered in this case is for patent infringement by Moore under the patent law of the United States. The patent statute provides: "A patentee shall have remedy by civil action for infringement" 35 U.S.C. § 281. Davis is not a patentee because he assigned all of his right, title and interest in the patents in suit to Scott (D.I. 113 at 5, ¶¶ 5 & 6). Davis, thus, has no standing to bring a civil suit against Moore for infringement of the patents owned entirely by Scott or to obtain attorney fees pursuant to 35 U.S.C. § 285.

## VII. SCOTT–DAVIS DISPUTE

Before briefing was completed in this case, a number of issues were in controversy between Davis and Scott. (D.I. 113, Section 5, Att. E.) From the representations contained in Scott's Answering Brief Against Davis (D.I. 187) and Davis' Reply Brief Against Scott (D.I. 191), however, it is clear that Scott and Davis have resolved most of their disputes by agreeing as follows:

1. Scott will first deduct its litigation expenses (which are not directly reimbursed by an award against Moore) together with interest compounded at the average prime rate from the date of various payments to date of recovery from Moore from the total damages awarded against Moore (including actual damages, prejudgment interest and enhanced damages under 35 U.S.C. § 284) and then will divide the balance equally between Scott and Davis.

2. Scott will pay under paragraph 11 of the 1965 Agreement between Davis and the S.D. Warren Company, Scott's predecessor, $111,000 for Davis' "time" and "expenses" incurred in connection with this patent litigation without requiring further justifying documentation, irrespective of eventual recovery from Moore.

3. Davis will not share in any attorney fees awarded to Scott from Moore.

The remaining unresolved disputes between Scott and Davis are as follows:

1. Davis contends that his attorney fees should be recouped by Davis from the total recovery awarded by the Court in this case to Scott before the net recovery is divided between them.

2. Scott also should pay Davis the agreed upon amount of $111,000 for Davis' "time" and "expenses" now rather than at the "final conclusion of this litigation."

With respect to the above two issues in dispute, Scott's legal obligations if any to Davis arise from the 1965 Davis-Warren Agreement (TX 307), the stipulation entered into by Scott and Davis on February 22, 1984 (D.I. 165), and the agreements

reached and set forth above in the briefs of those parties. (D.I. 187 and 191).

■ It is clear from the 1965 agreement that Davis agreed to give "technological assistance" concerning the Davis patents, and Scott contracted to pay Davis for his "expenses" and "time" in connection with "patent litigation" such as the present suit against Moore (TX 307, ¶ 11), and it is also clear from the agreements reached in their briefs that Scott will pay Davis $111,000 for these charges "irrespective of the eventual recovery from Moore" (D.I. 187 at 6). Based upon these two agreements, the Court concludes that Davis should be paid the $111,000 by Scott promptly rather than to delay payment until the "final conclusion of this litigation." Davis rendered the services and he should be paid now as his payment was not under the 1965 agreement contingent upon the successful outcome of any litigation for which he devoted time.

■ None of the agreements, however, require Scott to reimburse Davis for his fees and expenses of his personal attorney in this case. Under the American rule counsel fees are to be borne by the party who retains the attorney in the absence of contract or statute. See Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 247–271, 95 S.Ct. 1612, 1616–1629, 44 L.Ed.2d 141 (1975). Since there is no contractual obligation outstanding on Scott's part, Davis must bear the fees and expenses of his personal counsel in this action. This is not an unfair result especially in the light of the generosity shown by Scott in sharing the net infringement damage recovery equally with Davis as it has agreed to above. While the 1965 agreement between Davis and Warren (Scott) contemplated the possibility of patent infringement litigation, Scott did not obligate itself to undertake litigation to enforce the Davis patents against infringers, or to share infringement damages with Davis or pay Davis' attorney's fees. Had not Scott agreed to share the net infringement damages equally with Davis, his legal position of enforcing a recovery against Scott would have been extremely questionable because a strict legal interpretation of the original 1965 agreement does not so provide for sharing infringement damages. The 1965 agreement, of course, did obligate Scott to pay Davis' royalties (TX 307, ¶ 6). Davis argues that the term "royalty" should be construed to cover infringement damages recovered from Moore. This is a highly questionable interpretation. No royalties damages will be recovered in this case; all damages to be assessed are for wilful patent infringement. The Court, therefore, finds that Scott has been more than generous with Davis in sharing substantial damages with him which might otherwise have been difficult for him to recover absent the agreement reached in their post-trial briefs.

## VIII. CONCLUSION

Based upon the above findings of fact and conclusions of law encompassed in this opinion, the Court will enter a judgment in favor of Scott against Moore declaring: (1) the Davis patents in suit (the original and reissues) to be valid and enforceable against Moore; (2) the Scott-Moore license agreement was terminated by Moore in October, 1976; (3) the MCP recording paper sold by Moore thereafter infringed the Davis patents until they expired in mid-1982; (4) Moore is liable to Scott for actual damages in the amount of $7,470,607, plus prejudgment interest at the average prime rate applied variably in the amount of $5,050,985 through the end of 1983; (5) the damage award is to be doubled for Moore's wilful infringement; (6) Scott's reasonable attorney fees will be assessed against Moore for exceptional behavior; (7) Davis' attorney fees will not be assessed against Moore.

In addition, Scott will be required to submit promptly (1) a computation of prejudgment interest at the average prime rate applied variably for the period from January 1, 1984 to date of the judgment to be entered today, and (2) an application for reasonable attorney fees.

With respect to the controversy between Davis and Scott, the judgment will (1) deny the application of Davis for the allowance of attorney's fees against Scott, and (2) require Scott to pay Davis $111,000 for his "time" and "expenses" without further delay.

Finally, the judgment will provide for post-judgment interest to be computed in accordance with 28 U.S.C. § 1961.

Judgment will be entered in accordance with this Opinion.